USCA1 Opinion

 

 January 22, 1997 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT _________________________ No. 96-1143 JAMES LOGUE, SR., Plaintiff, Appellant, v. RONALD DORE, Defendant, Appellee. _________________________ ERRATA SHEET ERRATA SHEET The opinion of this court issued on January 8, 1997, is corrected as follows: On page 10, line 19 change "U.S." to "F.2d" On page 12, line 16 add a further sentence: "This case is no exception." UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 96-1143 JAMES LOGUE, SR., Plaintiff, Appellant, v. RONALD DORE, Defendant, Appellee. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Edward F. Harrington, U.S. District Judge] ___________________ _________________________ Before Selya and Stahl, Circuit Judges, ______________ and Woodlock,* District Judge. ______________ _________________________ William H. Rowerdink III for appellant. ________________________ Leonard H. Kesten, with whom Brody, Hardoon, Perkins & ___________________ ___________________________ Kesten was on brief, for appellee. ______ _________________________ January 8, 1997 _________________________ __________ *Of the District of Massachusetts, sitting by designation. SELYA, Circuit Judge. Asserting that the proceedings SELYA, Circuit Judge. ______________ below were tainted both by the district judge's mistaken view of the law and by his personal animus, plaintiff-appellant James Logue invites us to order a new trial before a different trier. We decline the invitation. I. BACKGROUND I. BACKGROUND Since one of Logue's principal complaints is that the district court took his false arrest and false imprisonment claims from the jury at the close of his case in chief, we assay the facts in the perspective most advantageous to Logue's position. See, e.g., Veranda Beach Club Ltd. Partnership v. ___ ____ _____________________________________ Western Sur. Co., 936 F.2d 1364, 1375 (1st Cir. 1991). ________________ In 1990, Logue and his wife became embroiled in divorce proceedings. Despite this discord, the couple continued for a time to share the marital domicile at 411 School St., Marshfield, Massachusetts. The situation changed on November 13, 1992, when Mrs. Logue secured an ex parte restraining order barring her estranged husband from the School St. premises.1 Pursuant to that order the Marshfield police asked Logue to remove himself from the property, and he complied.  ____________________ 1Mrs. Logue obtained the restraining order under a state law which provides that, in various situations (including matrimonial disputes), a court "may enter such temporary orders as it deems necessary to protect a plaintiff from abuse . . . ." Mass. Gen. L. ch. 209A, 4 (West 1996). The statute further provides that "[i]f the plaintiff demonstrates a substantial likelihood of immediate danger of abuse, the court may enter such temporary relief orders without notice . . . and shall immediately thereafter notify the defendant that the temporary orders have been issued." Id. In that event, "[n]otice shall be made by the ___ appropriate law enforcement agency." Id. ___ 3 Three days later Logue prevailed upon the state court to amend its November 13 order. The amendment gave Logue access to the premises between the hours of 8:00 a.m. and 6:00 p.m. so that he could continue to operate his painting business (which was based in a garage on the property). By its terms, the amended order expired on December 2, 1992. On that date, the state court convened a hearing to determine inter alia whether the restraining order should remain _____ ____ in effect, and if so, whether Logue should still be allowed limited access to the marital premises. The parties and their counsel appeared but, when the judge reserved decision, Logue and his lawyer departed without awaiting the ruling. Late that same morning the judge renewed the original restraining order, thereby effectively rescinding Logue's daytime privileges and banning him from the premises in toto. __ ____ Unaware that a completely prohibitory order had issued, Logue repaired to School St. on December 2. His wife returned that afternoon, told him of the judge's decision, and asked that he leave. Logue continued working. Disquieted, Mrs. Logue called the Marshfield police to report what she viewed as a blatant violation of the new restraining order. Officer Ronald Dore responded to the call. When Dore arrived, Mrs. Logue showed him a copy of the current restraining order. By that time, however, Logue had evacuated the premises. After leaving the scene Logue contacted his attorney in an effort to ascertain the terms of the new restrainer. He 4 received no definitive guidance. Instead, his lawyer instructed him to stop by his office the next morning so that they could straighten out the situation. As a matter of form, a restraining order of this sort is composed of a series of multicolored carbon copies to be distributed to various parties. Typically, there is a copy for the court's use, one for the probation department's use, one for the plaintiff, one for the defendant, one for the local police department, and a final copy on which the return of service is to be inscribed. Early on the morning of December 3, Dore reviewed the police copy of the newly minted restraining order. He then proceeded on routine patrol. In the meantime Logue bypassed his lawyer's office, returned to the marital residence, and resumed work. Dore observed Logue's vehicle in the driveway, confronted him in the garage, and turning a deaf ear to Logue's protest that he had the right to be on the property during the day, and that he could verify his status by a telephone call placed him under arrest for violating the restraining order. Dore transported Logue to police headquarters and booked him. Logue was then taken to the state court and arraigned. Eventually, the charges against him were dropped. Logue mounted a counterattack, suing Dore for damages under 42 U.S.C. 1983 in the federal district court. His complaint contained three counts that are germane to this 5 appeal.2 In those counts Logue contended that Dore had falsely arrested and imprisoned him, and had employed excessive force, all in derogation of section 1983. During trial, the district court directed a verdict in the defendant's favor on the false arrest and false imprisonment counts. The jury subsequently found for the defendant on the excessive force claim. Following a peculiar colloquy related to fees and costs (described infra _____ Part IV), Logue filed this appeal. II. THE DIRECTED VERDICT II. THE DIRECTED VERDICT Logue assigns error to the entry of judgment as a matter of law on the false arrest and false imprisonment claims, asserting that he adduced enough evidence to create a jury question as to whether Dore had probable cause to arrest him. The standard under which we review Logue's challenge is so familiar that it verges on the banal: without taking into consideration the credibility of witnesses, resolving conflicts in testimony, or evaluating the weight of the evidence, could a reasonable jury find for the plaintiff on the proof presented? See Gibson v. City of Cranston, 37 F.3d 731, 735 (1st Cir. 1994). ___ ______ ________________ We will affirm the judgment only if, after surveying the evidence and the inferences derivable therefrom in the light most flattering to the plaintiff, we determine that a rational factfinder could have reached no conclusion except that the  ____________________ 2Originally, Logue asserted other claims against Dore, various unnamed Marshfield police officers, and the Town of Marshfield. Because the case proceeded to trial only on the federal claims against Dore, we limit our discussion accordingly. 6 plaintiff take nothing. See Veranda Beach, 936 F.2d at 1375; ___ _____________ Wagenmann v. Adams, 829 F.2d 196, 200 (1st Cir. 1987). _________ _____ In trying the false arrest and false imprisonment counts, Logue's theory was that Dore violated his Fourth Amendment rights by arresting him without probable cause. According to Logue, there was no probable cause because Dore lacked any reason to believe that Logue knew the terms of the December 2 restraining order and intentionally violated it. The lower court rejected this premise. So do we. The constitutionality of a warrantless arrest "depends . . . upon whether, at the moment the arrest was made, the officer[] had probable cause to make it." Beck v. Ohio, 379 U.S. ____ ____ 89, 91 (1964). In turn, probable cause to make an arrest exists if and only if the facts and circumstances of which the arresting officer has knowledge are sufficient to lead an ordinarily prudent officer to conclude that an offense has been, is being, or is about to be committed, and that the putative arrestee is involved in the crime's commission. See Rivera v. ___ ______ Murphy, 979 F.2d 259, 263 (1st Cir. 1992); Hoffman v. Reali, 973 ______ _______ _____ F.2d 980, 985 (1st Cir. 1992). In sum, the existence of probable cause (and, in turn, the validity of an ensuing arrest) is gauged by an objective standard; as long as the circumstances surrounding the event warrant the officer's reasonable belief that the action taken is appropriate, the arrest is justified. See Scott v. United States, 436 U.S. 128, 137-38 (1978); United ___ _____ ______________ ______ States v. Figueroa, 818 F.2d 1020, 1023 (1st Cir. 1987); see also ______ ________ ___ ____ 7 Whren v. United States, 116 S. Ct. 1769, 1774 (1996) (holding _____ ______________ that "[s]ubjective intentions play no role in ordinary, probable- cause Fourth Amendment analysis"). And, moreover, though probable cause requires more than mere suspicion, it does not require the same quantum of proof as is needed to convict. See ___ United States v. Aguirre, 839 F.2d 854, 857-58 (1st Cir. 1988). _____________ _______ At first blush it appears that Dore surpassed this minimum. After all, the evidence is straightforward that an unqualified chapter 209A restraining order issued on December 2, and that order, by its terms, barred Logue from the School St. property. The record is equally pellucid that Dore learned the terms of that order on two separate occasions before taking action. Thus, Dore knew prior to arresting Logue that Logue's mere presence on the School St. premises transgressed the restraining order and thereby constituted a criminal act. In the lower court's view, no more was exigible. Logue seeks to blunt the force of this reasoning by elevating the probable cause threshold. He would have us rule that, in addition to the arresting officer's reasonable belief that the restraining order was being violated, probable cause in this case could only be established if the officer also believed that the violator himself knew the terms of the order. But this embellishment has no basis in the law. What the arrestee knows or does not know at the time of his apprehension is irrelevant to the question of whether the arresting officer has probable cause. To be frank, we find it difficult to understand the 8 nexus that Logue strives to fashion between the arrestee's knowledge and the probable cause determination. It seems most likely that Logue has confused the elements necessary to establish probable cause with the elements necessary to determine guilt or innocence. The arrestee's knowledge is, of course, relevant to the latter determination, for the Commonwealth, in order to convict Logue of violating the chapter 209A restraining order, would be required to show scienter, that is, to prove beyond a reasonable doubt that he had knowledge or notice that such an order had been issued against him. See Mass. Gen. L. ch. ___ 209A, 7 (West 1996); Commonwealth v. Gordon, 553 N.E.2d 915, ____________ ______ 918-19 & n.3 (Mass. 1990). Nevertheless, this requirement has no bearing on the reasonableness of Dore's belief that a crime was being committed (especially since he, himself, had told Logue what the order provided), and it therefore fails to address the existence vel non of probable cause.3 ___ ___ We will not paint the lily. In light of the facts and circumstances unquestionably known to Dore at the time of the arrest, no reasonable jury could find that he lacked probable cause to take Logue into custody. It follows inexorably that the  ____________________ 3Logue implies that Dore's refusal to allow him to make a telephone call to verify the terms of the December 2 order made the arrest unreasonable. To be sure, there are circumstances in which "an arresting officer may have a duty to pursue further information if it is available and likely to be trustworthy." Palhava de Varella-Cid v. Boston Five Cents Sav. Bank, 787 F.2d ______________________ ___________________________ 676, 680 (1st Cir. 1986). In this situation, however, further investigation merely would have buttressed the officer's belief and confirmed Logue's violation of the chapter 209A restraining order. Thus, Logue's argument is not advanced by Dore's rebuff. 9 district court appropriately granted judgment as a matter of law in favor of the defendant on the false arrest and false imprisonment counts. III. THE JUDGE'S ATTITUDE III. THE JUDGE'S ATTITUDE Logue's next assignment of error sweeps more broadly. He contends that the district judge's biased attitude and heavy- handed manner deprived him of an impartial trial, and that fundamental fairness demands that we wipe the slate clean. These are serious charges, and we treat them as such. We start with an overview of the settled legal principles that pertain to claims of this genre. It is well- established that a judge is not a mere umpire; he is "the governor of the trial for the purpose of assuring its proper conduct," and has a perfect right albeit a right that should be exercised with care to participate actively in the trial proper. Quercia v. United States, 289 U.S. 466, 469 (1933). It _______ _____________ is, moreover, beyond cavil that a trial judge in the federal system retains the common law power to question witnesses and to analyze, dissect, explain, summarize, and comment on the evidence. See id.; see also United States v. Paiva, 892 F.2d ___ ___ ___ ____ _____________ _____ 148, 159 (1st Cir. 1989); see generally Fed. R. Evid. 614(b). ___ _________ Still, there are lines which a trial judge should not cross. For example, the judge's participation must be balanced; he cannot become an advocate or otherwise use his judicial powers to advantage or disadvantage a party unfairly. See Quercia, 289 ___ _______ U.S. at 470; Paiva, 892 F.2d at 159; see also Fed. R. Evid. _____ ___ ____ 10 614(b) advisory committee's note. An inquiry into the judge's conduct of the trial necessarily turns on the question of whether the complaining party can show serious prejudice. See Aggarwal v. Ponce Sch. of ___ ________ _____________ Med., 837 F.2d 17, 22 (1st Cir. 1988). In answering this ____ question a reviewing court must evaluate the judge's actions "according to a standard of fairness and impartiality, recognizing that each case tends to be fact-specific." United ______ States v. Polito, 856 F.2d 414, 418 (1st Cir. 1988) (citations ______ ______ and internal quotation marks omitted). This process requires the reviewing court to differentiate between expressions of impatience, annoyance or ire, on the one hand, and bias or partiality, on the other hand. See Liteky v. United States, 510 ___ ______ _____________ U.S. 540, 555-56 (1994). While the former are not to be encouraged, the latter are flatly prohibited. In this case, Logue contends that the judge's comments, questioning of witnesses, and chastisement of his trial counsel (Attorney Stockwell-Alpert) skewed the proceedings. Having painstakingly reviewed the transcript of this five-day trial, we are satisfied that the incidents of which Logue complains show little more than the judge's efforts to clarify testimony, expedite the trial, and maintain courtroom decorum. In short, we find that Logue received a fair trial, albeit not a perfect or an unblemished one. He was not entitled to more. See Polito, 856 ___ ______ U.S. at 418. We see no need to cite book and verse in response to 11 each of Logue's criticisms. A summary should suffice. 1. Logue asserts that the judge exhibited bias both by 1. interjecting hostile questions during his testimony and by treating the defendant's testimony solicitously. However, a close reading of the transcript reveals no such contrast. A judge has wide discretion to interject questions in order to throw light upon testimony or expedite the pace of a trial. See ___ Deary v. City of Gloucester, 9 F.3d 191, 194-95 (1st Cir. 1993); _____ __________________ United States v. Olmstead, 832 F.2d 642, 648 (1st Cir. 1987), _____________ ________ cert. denied, 486 U.S. 1009 (1988). Here, the judge's questions _____ ______ strike us as designed to simplify the jury's task, and, in respect to Logue's testimony, to clarify his frequently vague and confusing answers. Many of the judge's queries did no more than restate the examiner's questions, and his oft-uttered responses (e.g., "all right" or "I see") to Logue's answers were well within the realm of impartiality. 2. Logue's claim that the judge displayed bias against 2. him rests heavily on two comments. First, the judge referred to Logue in the jury's presence as "the accuser." We regard the comment as innocuous, particularly when its likely impact is evaluated on the entire record. This case is no exception. More troubling is that, after Logue completed his testimony, the judge excused the jury and made the following statement: I just want to put it on the record that I totally disbelieve the plaintiff in this case. I think he's an absolute and incorrigible liar. And it's my intention at the conclusion of this case to request the United States Attorney to conduct an investigation into these matters relative to seeking an indictment for perjury. 12 To be sure, it was unnecessary for the judge to go on record at that stage, but his comments indicate no more than that he had grave doubts anent Logue's credibility. Judges are not expected to refrain from forming opinions about witnesses' credibility how else would a judge be able to decide a case or pass on a motion for a new trial? and the mere fact that the judge voices his opinion out of the presence of the jury does not irretrievably taint the trial. Cf. Liteky, 510 U.S. 550-51 ("The ___ ______ judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings . . . ."). Since there is no evidence that the judge allowed his low opinion of Logue's veracity to mar his conduct of the trial, we will not disturb the judgment. Logue was entitled to an impartial judge; he was not entitled to an ingenuous one. 3. Logue further contends that the judge's 3. disparagement of Stockwell-Alpert deprived him of a fair trial. As a general rule, a judge's mid-trial remarks critical of counsel are insufficient to sustain a claim of judicial bias or partiality against the client. See Liteky, 510 U.S. at 555. ___ ______ Here, the challenged comments occurred at various times, some at sidebar and some in the presence of the jury. The comments at sidebar need not detain us; it suffices to say that 13 none were beyond the pale. In the most ill-advised such remark, the judge referred to the lawyer as a "smart little guy." The description would have been better left unsaid, but it scarcely amounts to reversible error. Statements that are made by a judge in the jury's presence are, of course, subjected to stricter scrutiny. In this case, the judge was sharply critical for example he made remarks to the effect that Stockwell-Alpert was hurting himself by making unnecessary comments after rulings, talking back to the court, leading witnesses on direct examination, and hollering at an adverse witness but the criticisms were largely invited by counsel's antics and were fairly calculated to maintain courtroom decorum.4 While the judge could perhaps have been more delicate in his choice of phrase, appellate courts cannot expect that a trial judge, under siege, will function as a bloodless automaton. See Polito, 854 F.2d at 418. Granting the judge a "margin of ___ ______ humanity," id., we do not think that his comments in this case ___ evinced bias. See Mitchell v. Kirk, 20 F.3d 936, 937-38 (8th ___ ________ ____ Cir. 1994); see also Liteky, 510 U.S. at 555-56 (explaining that ___ ____ ______ routine efforts at court administration by a judge do not evince bias or partiality). In any event, gauging the likely impact of the judge's statements on the record as a whole, we conclude that  ____________________ 4On one occasion, the judge imposed a monetary sanction on Stockwell-Alpert for making a wholly gratuitous comment after the judge had instructed the jury on a point of law. This comment was preceded by several similar comments which could reasonably be viewed as tending to disparage the judge and undermine his authority. The sanction was imposed outside the jury's presence. 14 they did not compromise the fundamental fairness of the proceedings. See Deary, 9 F.3d at 195-96. ___ _____ We add a coda. In assessing the impact of a judge's actions, jury instructions can be a means of allaying potential prejudice. See id. at 196; Polito, 856 F.2d at 419. Here, the ___ ___ ______ judge told the jurors in his charge that he had not intended to comment on the evidence or to suggest "what verdict I think you should find." He also told them that, if they thought he had commented, they should disregard the comments. Finally, he warned the jurors "not [to] be swayed by bias or prejudice or favor as to any party," and stressed their prerogatives as "the sole and exclusive judges of the facts." These instructions were sufficient to palliate any untoward effects. IV. THE EVANESCENT FEE DISPUTE IV. THE EVANESCENT FEE DISPUTE After the jury returned its verdict, a curious episode occurred. The judge made an extemporaneous (and extremely unflattering) assessment of Logue's case,5 and spontaneously directed Dore's counsel to "charge all expenses and reasonable attorneys' fees to th[e] plaintiff." The judge then granted the defendant's oral motion to attach the plaintiff's real estate in the amount of $50,000 as security for those fees and expenses.6  ____________________ 5The judge volunteered his opinion that the case "was bottomed on perjury" and that it represented "an attempt on the part of this plaintiff . . . to perpetrate a fraud on the system." 6Despite his scathing critique of Logue's case, the judge never indicated the legal basis on which the anticipated shifting of fees rested. In a "best case" scenario, this lack of specificity creates potential problems for a reviewing court. 15 Dore recorded the attachment but never filed an application for attorneys' fees. Although the parties argue in their briefs about the "fee award," it is apparent that none exists. The district court's announcement of a willingness to tax fees and expenses against a losing party does not constitute an award, and, in the absence of an order or judgment susceptible of execution, the court's free-floating announcement of its views provides no basis for appellate intervention. After all, appellate courts review orders and judgments, not judge's statements. See In re ___ ______ Administrative Warrant, 585 F.2d 1152, 1153 (1st Cir. 1978). _______________________ Moreover, the defendant effectively waived the right to attorneys' fees by his conceded failure to file and serve a properly supported application within fourteen days of the entry of judgment. See Fed. R. Civ. P. 54(d). Under the ___ circumstances, an attachment, designed to secure an anticipated award of fees which was never reduced to judgment and for which the prevailing party never applied, cannot stand. In the interest of completeness, we note that, in response to vigorous questioning on this point during oral argument, defense counsel conceded the untenability of Dore's  ____________________ See, e.g., Foster v. Mydas Assocs., Inc., 943 F.2d 139, 141-42 ___ ____ ______ ____________________ (1st Cir. 1991) (holding that a district court must, at a bare minimum, identify the source of the presumed authority undergirding a fee award, for "different sources of authority impose varying criteria for judging the [award's] appropriateness"). Here, however, the judge never made an actual fee award, see infra, and we are thus spared the necessity for ___ _____ grappling with these problems today. 16 position and agreed to move promptly to dissolve the attachment. We have received a copy of a letter reporting that he has kept his promise. Nothing remains of this issue. V. CONCLUSION V. CONCLUSION We need go no further.7 The judgment in favor of the defendant is not infected by reversible error. The district court's impromptu direction for the shifting of fees is without independent force as a judgment or order; and, because steps have been taken to dissolve the ensuing attachment, the parties' dispute over attorneys' fees presents no issue suitable for appellate review. The judgment is affirmed on the merits. Each party The judgment is affirmed on the merits. Each party _________________________________________ ___________ shall bear his own costs. shall bear his own costs. ________________________  ____________________ 7In his brief, Dore requests that we invoke Fed. R. App. P. 38 and impose sanctions on the plaintiff for prosecuting a frivolous appeal. We are not inclined to do so. The plaintiff's arguments concerning the conduct of the trial are colorable, even though not persuasive, and his assignment of error vis- -vis the improvidently issued attachment possesses obvious merit. 17