<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 97-1663

                         UNITED STATES,

                           Appellee,

                               v.

                    JOSE ORLANDO FERNANDEZ,

                     Defendant, Appellant.

          APPEAL FROM THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF PUERTO RICO

        [Hon. Daniel R. Domnguez, U.S. District Judge]

                             Before

                     Selya, Circuit Judge,
                                
               Campbell, Senior Circuit Judge,  
                                
                  and Stahl, Circuit Judge.
                                
                                

    Neal Gary Rosensweig with whom Leonard F. Baer was on brief
for appellant.
    Jose A. Ruiz, Assistant U.S. Attorney, with whom Guillermo
Gil, United States Attorney, was on brief for appellee.

May 29, 1998

                                
                                

 CAMPBELL, Senior Circuit Judge.  A jury convicted Jose
Orlando Fernandez of conspiring to import heroin, 21 U.S.C.  
841(a), 846, and of conspiring to possess heroin with intent to
distribute, 21 U.S.C.  952(a), 963.  He now argues that a number
of procedural errors deprived him of a fair trial.  Disagreeing, we
affirm.
                             FACTS
 In reviewing a judgment of conviction, we consider the
facts, as supported by the record, in the light most favorable to
the government.  See United States v. Pitrone, 115 F.3d 1, 3 (1st
Cir. 1997).
 On July 28, 1996, the cruise ship Seaward docked in Old
San Juan, Puerto Rico.  Just after 3:00 p.m., U.S. Customs agents
detained one of the Seaward's crew, Howard White, a Jamaican
national, on suspicion of drug possession.  A search revealed that
White was carrying heroin.  White immediately agreed to cooperate
with government officials.   
 White told the agents and testified at trial that he had
received the heroin from a Colombian in Curacao.  The Colombian had
given White a piece of paper bearing two telephone numbers and the
name "Miguel."  According to White, the Colombian supplier advised
him that the telephone numbers were Miguel's and that Miguel was
another Colombian living in Puerto Rico.  The supplier told White
to call Miguel at the numbers and turn the drugs over to him.  At
the time of his detention, White was carrying a piece of paper,
later admitted into evidence, bearing the name "Miguel" and two
phone numbers.  It was later found that one of the numbers was for
defendant Fernandez's cellular phone; the other was for a room at
the El San Juan Towers rented by Fernandez and used by both
Fernandez and Miguel Garzon.   
 White testified that hours before his encounter with
Customs officials, at around 12:30 in the afternoon, he had
telephoned one of the numbers and set up a meeting with a person
who identified himself on the phone as Miguel.  Fernandez admitted
at trial that he had responded to such a call and had indeed said
he was Miguel.  Miguel Garzon was present with Fernandez when the
latter spoke with White.  White testified to meeting with Miguel
Garzon and a second individual whom White identified as Fernandez
at 2:30   an hour before Customs agents found White with the
heroin.  According to White, Fernandez asked whether White had
brought the "stuff."  White told Fernandez that the drugs were
still aboard the Seaward.  Fernandez instructed White to retrieve
the drugs and bring them to a meeting later in the same place.  
According to one of the agents who first questioned White, White
had admitted that he and Fernandez agreed that Fernandez would
purchase the heroin at their next meeting for $3000.   
 It was as White was disembarking the Seaward and
returning to meet Fernandez that Customs agents stopped and
searched him.  When White offered to cooperate, the Customs
officials set up a "controlled buy" with White.  At 4:30 and again
at 6:30 the same day, they recorded two telephone calls (later
played to the jury) from White to Fernandez in which the two
arranged to meet at a nearby pier.  On each occasion, language
difficulties between White and Fernandez required a government
agent, posing as an acquaintance of White's, to serve as an
interpreter.  
 White went to the meeting place, accompanied by a
government agent who posed as an acquaintance of White's and served
as an interpreter.  Other agents secretly positioned themselves
around the scene.  Fernandez and Garzon then arrived.  According to
the government agent present with White, Fernandez stated that he
disliked their meeting place because it tended to be populated by
Customs agents.  Both Fernandez and Garzon asked White and the
government agent to get in the car.  White and the agent refused;
Fernandez parked the vehicle and emerged, without Garzon, to meet
with White.   
 White, Fernandez, and the government agent then proceeded
to a nearby public restroom, with Garzon remaining in Fernandez's
car.  White lifted his shirt to show Fernandez what appeared to be
heroin, and Fernandez showed a roll of cash.  Fernandez again asked
that they move to the car, and again White and the agent refused.  
Fernandez then told White and the agent that the deal would take
place in the car or not at all, and turned to walk back to the car.  
 Government agents then arrested both Fernandez and
Garzon.  Fernandez was discovered to be carrying $5000 in cash.  
Immediately after the arrest, Garzon consented to a search of the
room at the El San Juan Towers.  That search revealed that Garzon
had leased the room; during the search, a woman called the room and
identified herself as Fernandez's wife.   
 At trial, Fernandez testified that he had unwillingly and
unknowingly been made a part of co-defendant Garzon's drug
dealings.  Fernandez explained that he made a living as a producer
and promoter of music groups, and that he befriended Garzon because
Garzon claimed also to be in the music business.  Fernandez offered
Garzon the use of the room at the El San Juan Towers; Fernandez had
initially rented the room for a foreign band that had canceled
plans to play in Puerto Rico.  Fernandez admitted giving Garzon the
keys to the apartment and the number to his cellular phone.
 Fernandez testified that he went to the drug buy not
realizing it was an illicit transaction but thinking it was an
opportunity to receive an honest payment of a debt owed by Garzon.  
Garzon owed him rent on the El San Juan Towers room, and Garzon
told him that his brother was sending him money that he could use
to satisfy the debt.  According to Fernandez, he agreed to speak to
White on the phone only because White and Garzon were having
difficulty communicating.  Fernandez went to the final meeting
under the impression that Garzon's acquaintance would simply pay
him cash.  Upon learning that White had no money, he walked away.  
Fernandez testified that he had no idea that drugs were involved.  
As for the $5,000 found on him at the time of his arrest, Fernandez
stated that a fellow music promoter named Cheo Cruz had given him
the money as payment for Fernandez's music services.
   On cross-examination, Fernandez contradicted several
statements made by government witnesses.  Specifically, Fernandez
denied that he met with White in the early afternoon of July 28,
1996, that he showed the agent a wad of money at the pier
encounter, and that he told the agent that he was reluctant to
complete the exchange at the pier because of the prevalence of
Customs agents.   
 The jury returned a verdict of conviction on all counts,
and this appeal followed.
                           DISCUSSION
 Fernandez argues that the trial court made several
errors, the cumulative effect of which was to deny him a
fundamentally fair trial.  After reviewing the record, we conclude
that a new trial is not warranted.  We review each claim of error
in turn.
1.  Failure To Instruct the Jury Regarding Accomplice
   Testimony

 Fernandez complains that the district court did not  
instruct the jury that it should take special care in crediting the
testimony of White, Fernandez's alleged co-conspirator.  "It is
well established that an accomplice is qualified to testify as long
as . . . the 'judge [gives] complete and correct instructions
detailing the special care the jury should take in assessing the
testimony.'"  United States v. Hernandez, 109 F.3d 13, 15 (1st Cir.
1997) (quoting United States v. Ortiz-Arrigoitia, 996 F.2d 436,
438-39 (1st Cir. 1993)).   
 As Fernandez at no time asked for a "special care"
instruction at trial, our review is for plain error.  See Fed. R.
Crim. P. 52(b); United States v. Olano, 507 U.S. 725, 732 (1993).  
We have held that it is not plain error for the district court not
"to give an unrequested cautionary instruction where the
government's case largely depends on uncorroborated informant or
accomplice testimony, so long as such testimony looks internally
consistent and credible."  United States v. House, 471 F.2d 886,
888-89 (1st Cir. 1973).  This standard was met here, as White's
version of events was neither inconsistent nor incredible.   
 White's testimony was, moreover, corroborated by other
evidence.  When White was found with the heroin, he was carrying a
piece of paper bearing two phone numbers registered in Fernandez's
name.  Upon being called at one of the numbers, Fernandez agreed to
meet with White and was arrested at the prearranged place carrying
$5,000.  In the phone conversations recorded by government agents
and played for the jury, Fernandez never indicated that, as he
later testified, he expected to be receiving money, not drugs.  At
the last meeting between White and Fernandez, a government agent
testified that Fernandez was shown the sham heroin and that he
displayed his cash to White.  The agent testified that Fernandez
voiced concern about the presence of Customs agents in the area of
the aborted transaction, a concern inconsistent with innocent
activity.  Each of these items belied Fernandez's claim to have
been unaware of the illicit nature of the meeting, and supported
White's testimony that Fernandez was a party to an attempted drug
transaction.
2.  Admission of the Government's Version of the Facts
 Fernandez complains that when a copy of White's plea
agreement was placed in evidence it improperly included a statement
of the government's version of the facts.  While on appeal
Fernandez takes no exception to admission of the plea agreement
itself, he strenuously contends that the failure to eliminate from
it the government's version of the facts was a serious and very
prejudicial error.  However, at trial, Fernandez's counsel made no
objection to admission of the government's version of the facts.  
Rather he objected to admitting the plea agreement, asserting it to
be irrelevant, and disclaiming any other basis for exclusion.  We
accordingly review his present objection for plain error alone.  
For an error to be such, it must indeed be "plain," or "obvious,"
see Olano, 507 U.S. at 734, and it must "affect substantial
rights," Fed. R. Crim. P. 52(b), that is, "[i]t must have affected
the outcome of the district court proceedings," Olano, 507 U.S. at
734.  Additionally, a Court of Appeals will remedy such an error
only if it appears that it "seriously affect[ed] the fairness,
integrity or public reputation of judicial proceedings."  Id., 507
U.S. at 736 (quoting United States v. Atkinson, 297 U.S. 157, 160
(1936)).
 In the present circumstances it is debatable whether
submission of the government's version of the facts along with the
plea agreement was, if error, error that was plain or obvious.  It
does not appear that the judge even knew that the government's
version of facts was being submitted with the plea.  See United
States  v. Binker, 795 F.2d 1218, 1227 (5th Cir. 1986) (finding no
plain error in admission of plea agreement containing improper
vouching where error "was something all concerned wholly
overlooked").  Apart from this, however, no sufficient showing of
prejudice has been made out.  Fernandez's appellate brief points to
no specific prejudice, discussing this issue only in a paragraph so
cursory as to be disregarded.  See United States v. Zannino, 895
F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory
manner, unaccompanied by some effort at developed argumentation,
are deemed waived.").  While the government's factual version
attached to White's plea agreement contained hearsay implicating
Fernandez in the conspiracy, its narrative was little different
from White's in-court testimony and the other evidence presented at
Fernandez's trial.  We do not find plain error.
3.  Improper Cross-Examination  
 Fernandez next claims that the district court erred in
allowing the government to ask Fernandez whether prosecution
witnesses were lying.  During the prosecution's case-in-chief,
Officer Juan Rivera testified that Fernandez showed him a roll of
cash at the scene of the aborted drug sale, and that Fernandez had
complained that the area was known to be patrolled by Customs
agents.  When Fernandez contradicted Rivera's testimony, the
prosecutor asked him three times whether Agent Rivera was lying.            
                   The prosecutor also asked Fernandez whether White was lying when he
                   testified that he and Fernandez had met at noon on the day of the
                   arrest.
                        We have recently emphasized that "counsel should not ask
                   one witness to comment on the veracity of the testimony of another
                   witness."  United States v. Sullivan, 85 F.3d 743, 750 (1st Cir.
                   1996); see also United States v. Akitoye, 923 F.2d 221, 224 (1st
                   Cir. 1991).  "[This] rule reserves to the jury questions of
                   credibility and thus makes it improper to induce a witness to say
                   another witness lied on the stand."  Sullivan, 85 F.3d at 750.  
                   Again, as Fernandez failed to object, we review only for plain
                   error.
                        Here, the government asked Fernandez to impugn the
                   veracity of a government agent.  Given the faith a jury may place
                   in the word of a law enforcement officer, it is unfair to force a
                   criminal defendant to choose between recanting and calling a law
                   officer a liar.  See Sullivan, 85 F.3d at 750 n.4 ("Whether a
                   witness is a government agent may be relevant in determining
                   whether there is prejudice or a miscarriage of justice); United
                   States v. Boyd, 54 F.3d 868, 871 (D.C. Cir. 1995) ("It is . . .
                   error for a prosecutor to induce a witness to testify that another
                   witness, and in particular a government agent, has lied on the
                   stand."); United States v. Scanio, 900 F.2d 485, 493 (2d Cir. 1990)
                   ("[W]e have shown special concern with prosecutors utilizing what
                   some persons perceive as the heightened credibility of government
                   agents." (internal citations omitted)), overruled on other grounds,
                   Ratzlaf v. United States, 510 U.S. 135 (1994).   
                        Hence, the prosecutor's questions should not have been
                   phrased as they were.  However, to constitute plain error they must
                   potentially have affected the outcome of the district court
                   proceedings.  See Olano, 507 U.S. at 734-35 (explaining defendant
                   must demonstrate prejudicial error, defined as having "affected the
                   outcome of [the trial]"); see also United States v. Gonzalez-
                   Torres, 980 F.2d 788, 791 (1st Cir. 1992).  We see no way that
                   these few miscast questions could have so tainted the trial as to
                   affect its outcome.  Much of the case against Fernandez rested on
                   undisputed evidence:  White, the courier/seller,  was arrested with
                   drugs on his person and with Fernandez's phone numbers.  Calls to
                   these numbers reached Fernandez, who responded to the name "Miguel"
                   shown in the writing carried by White.  Fernandez unhesitatingly
                   arranged to meet with White for some kind of clandestine
                   transaction.  When arrested at the meeting place he had $5,000 in
                   cash on his person.  On top of these uncontested facts there was
                   further incriminating testimony by government agents, such as that
                   Fernandez saw the fake heroin, displayed his money, and objected to
                   the particular locale because of the prevalence of Customs agents.  
                        Fernandez's defense to the above was to deny the agent's
                   version of his behavior just before arrest, and explain his
                   conceded willingness to meet with White as part of an innocent
                   bill-paying scam set up by his associate, Miguel Garzon.  Fernandez
                   testified he had purportedly become Garzon's creditor on a whim,
                   giving him the use of his apartment and cellular phone because "I
                   [Fernandez] could trust him . . . even though I didn't know him
                   very well, I would do this favor for him because he was a music
                   colleague of mine."  None of this story was corroborated on the
                   telephone tapes, much less by the other witnesses's testimony.  
                   Fernandez's explanation failed to account reasonably for White's
                   possession of Fernandez's phone numbers, nor did it explain
                   plausibly why Fernandez identified himself as Miguel on the phone,
                   nor why he never mentioned the alleged debt he was owed, instead
                   telling White "you have work for me."  Given the strength of the
                   government's case, it stretches credulity to believe that the
                   improper framing of these unobjected-to questions affected the
                   outcome of the trial.  
                   4.   Improper Prosecutorial Comments
                        Fernandez also urges that we reverse his conviction based
                   on the prosecution's reference before the jury to an unproven  
                   document never put in evidence.  This was a lease agreement
                   supposedly made by Garzon to rent the same apartment later rented
                   by Fernandez.  Interrogating Fernandez, the prosecutor asked,
                   "[s]ir, this is a contract made by Mr. Miguel Garzon, on rental
                   unit number 268 at ESJ Towers, the same rental unit that you rented
                   on July 1996?"  After defense counsel objected, the court  
                   instructed the prosecutor to make no further reference to the
                   unidentified agreement.  The prosecutor then revised the inquiry to
                   ask, "[s]ir, would you be surprised that Mr. Miguel Garzon rented
                   this same apartment you rented in July, approximately one year
                   before?"  The court at first allowed this, but later sustained
                   defense counsel's objection and ordered the government not to
                   proceed with any questions as to contents of the alleged document.  
                        An earlier Garzon lease, had one been proven, would tend
                   to impeach Fernandez's testimony that he had met Garzon only a few
                   days before their arrest.  While it is reprehensible, in the jury's
                   presence, to frame questions so as to suggest matters not in
                   evidence, the court's sustaining of the objections limited the
                   damage in large measure.  We would have preferred the court to have
                   instructed the jury then and there to disregard any suggestion of
                   a prior Garzon lease.  At least, however, the issue was abandoned
                   and was not mentioned during closing argument.  Moreover, the judge
                   told the jury in closing instructions that "[s]tatements and
                   arguments of counsel are not evidence in the case, unless made as
                   an admission or stipulation."  Defense counsel never moved to
                   strike nor did he seek a mistrial or a more pointed curative
                   instruction.  We find insufficient prejudice in the circumstances  
                   to warrant a new trial.  
                   5.   Questions from the Bench
                        Defendant urges that we find a major error in the court's
                   close questioning of Fernandez.  After the prosecution finished
                   cross-examining Fernandez, the court questioned him at length in
                   the presence of the jury.  The court's examination occupied some
                   eighteen pages of trial transcript, covering several areas of
                   Fernandez's previous testimony.  The first and lengthiest line of
                   questioning dealt with the timing of Fernandez's meetings with
                   White on the day of the arrest.  The judge also asked Fernandez to
                   explain several of his statements, including his telling White, in
                   a taped telephone conversation, that "you [i.e., White] have work
                   for me."  The judge then covered three issues in brief, asking
                   Fernandez about the amount of money he was carrying at the time of
                   his arrest, his job as a music producer, and the rental of the room
                   at the El San Juan Towers.  Following the judge's questioning,
                   Fernandez answered questions on redirect and recross-examination.
                        "Because [Fernandez] did not object to the judge's
                   questioning during trial, the conduct complained of will be
         considered under the plain error doctrine."            Gonzalez-Torres, 980
                   F.2d at 791.  See supra.  After a careful review of the record, we
                   cannot say that the judge's questioning constituted plain error.
                        As a general matter, a trial judge "has a perfect right
                     albeit a right that should be exercised with care   to
                   participate actively in the trial."  Logue v. Dore, 103 F.3d 1040,
                   1045 (1st Cir. 1997) (citing Quercia v. United States, 289 U.S.
                   466, 469 (1933)); see also Fed. R. Evid. 614(b).  Judicial
                   questioning is welcome "to throw light upon testimony," Logue, 103
                   F.3d at 1045, or "to provide a clear presentation of the issues, so
                   long as an attitude of impartiality is preserved," Gonzalez-Torres,
                   980 F.2d at 792.
                        Here,  Fernandez claims that the "inquiry could have had
                   no other effect on the jury than to persuade it of the existence of
                   a conspiracy to import drugs" and that much of Fernandez's
                   testimony was untruthful.  We think this misstates the tenor and
                   effect of the court's inquiry.  Rather, we think the judge sought
                   impartially to clarify Fernandez's testimony.  Much of Fernandez's
                   testimony was confused, stemming in part from the language barrier,
                   and in part from Fernandez's own obfuscations.  Thus, the judge
                   prefaced his questions with phrases like "[s]ir, so there is no
                   confusion," and "I don't want to confuse you.  What I want to do is
                   get the facts straight for the jury to be able to understand them."  
                   As in Logue, "the judge's questions strike us as designed to
                   simplify the jury's task, and . . . to clarify [the witness's]
                   frequently vague and confusing answers."  103 F.3d at 1045.  While
                   on more than one occasion the judge worded his questions sharply,
                   he did so only after Fernandez contradicted his own testimony and
                   recorded statements.  The judge's conduct, viewed as a whole, was
                   not indicative of bias.  His repeated responses to Fernandez's
                   answers (typically "all right" or "okay") were benign; virtually
                   all of his questions repeated earlier queries, see Logue, 103 F.3d
                   at 1045; and he instructed the jury that it was to assume he held
                   no opinion as to the facts, see id. at 1046-47 (explaining that
                   jury instruction helped avoid bias from judge's questioning);
                   Gonzalez-Torres, 980 F.2d at 792 (same).  
                        To the extent the court's inquiry exposed flaws in
                   Fernandez's defense, this was not because the questions were unfair
                   but because Fernandez provided answers that were themselves
                   evasive, incredible, and patently contradictory to his previous
                   statements.  Our reading of the transcript convinces us that the
                   judge's questioning did not transgress the court's inherent power
                   to participate objectively in the conduct of the trial.
                   6.   Cumulative Effect
                        Finally, Fernandez argues that the cumulative effect of  
                   the asserted errors was to deprive him of a fair trial.  
                   "Individual errors, insufficient in themselves to necessitate a new
                   trial, may in the aggregate have a more debilitating effect,"
                   United States v. Sepulveda, 15 F.3d 1161, 1195-96 (1st Cir. 1995),
                   so as to deny due process.  See, e.g., United States v. Dwyer, 843
                   F.2d 60, 65 (1st Cir. 1988); Dunn v. Perrin, 570 F.2d 21, 25 (1st
                   Cir. 1978).  In assessing the errors' cumulative effect, we are to
                   consider the entire record, "paying particular weight to factors
                   such as the nature and number of the errors committed; their
                   interrelationship, if any, and combined effect; how the district
                   court dealt with the errors as they arose (including the efficacy
                     or lack of efficacy   of any remedial efforts; and the strength
                   of the government's case."  Sepulveda, 15 F.3d at 1196.  An
                   additional consideration is the length of the trial:  the shorter
                   the proceedings, the greater the impact of even a few errors.  Seeid.
                        Here, only certain of the challenged conduct amounted to
                   error, and as to this we are unable to say that it was of such
                   gravity and frequency as to have deprived Fernandez of a fair
                   trial.  The evidence of Fernandez's conscious participation in the
                   attempted drug transaction was exceedingly strong.  Fernandez had
                   the opportunity to attempt to rebut this evidence by offering his
                   version of why he so readily responded to White's phone calls,
                   passed himself off as Miguel, and sought to meet with White bearing
                   $5,000 in cash.  The errors Fernandez cites, viewed individually or
                   cumulatively, did not seriously impede his ability to present his
                   defense to the jury.
                        The conviction is affirmed.

</body>

</html>