Barbara Ann DIXON, Plaintiff–
Appellant,

v.

FEDERAL EXPRESS
CORPORATION, Defendant–Appellee.

No. 00–6145.

United States Court of Appeals,
Sixth Circuit.

March 19, 2002.

Before JONES and COLE, Circuit
Judges;  GWIN, District Judge.*

* The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

PER CURIAM.

Barbara Dixon, the plaintiff in this employment discrimination action, appeals from a jury verdict in favor of the defendant, Federal Express Corporation ("FedEx"). We are called upon to decide two issues: (1) whether judicial misconduct tainted the proceedings, thereby preventing Dixon from receiving a fair trial; and (2) whether the taxation of discretionary costs against Dixon was improper. Having reviewed the trial transcript as well as the briefs filed in this appeal, we conclude that the conduct of the district judge compromised Dixon's right to a fair trial. Accordingly, we vacate the jury's verdict and remand for a new trial before a different district judge.[1]

## DIXON'S TERMINATION

In May 1983, Dixon began employment with FedEx as a data entry clerk. In April 1990, she joined FedEx's Customer Service department and began work in the International Trace section of that department. Her job responsibilities as a customer service representative included (i) fielding telephone calls from customers regarding the status of shipments, (ii) scheduling pick-ups for FedEx drivers, (iii) directing customers to various locations, and (iv) tracking FedEx shipments.

FedEx employees in the International Trace section use a telephone/time-keeping system known as the "Automatic Call Distributor" ("ACD"). The ACD records employee hours worked and is used to calculate employee compensation. The system is accessed through telephones situated throughout the building in which the work area is located. Employees clock on and off the system by entering personal codes

FedEx assigns to them. The act of signing in to the ACD system indicates that the employee is present and available to receive calls. FedEx likewise requires its employees to sign out of the ACD system for lunch and at the end of the shift. Employees are prohibited from signing each other in and out of the ACD. Such conduct constitutes "falsification of records" and is a terminable offense under company policy.

The current dispute arises out of events which occurred on February 6, 1998. On that morning, Dixon's senior manager, Teresa Porter, arrived at the International Trace section at approximately 4:30 A.M. Dixon's shift started at 6:15 A.M. At some point after Porter arrived at the work area, she logged onto the ACD and noticed that Dixon was also logged in. The ACD indicated that Dixon had signed in at 6:16 A.M., but Porter was unable to locate Dixon at her assigned work station. Porter printed out an ACD log sheet for that morning and sent an e-mail to Dixon's direct supervisor, Jacqueline Casey, reporting that although Dixon was signed in on the ACD, Porter could not find her anywhere near her work station.

At 6:40 A.M., Porter observed Dixon walking to her work station and allegedly heard Dixon greet co-workers as if she were just arriving to work. The ACD records for February 6 reflect the following entries under Dixon's employee code:

| Time In | Time Out | Min:Sec |
|---------|----------|---------|
| 06:16:22 | 06:29:22 | 13:00 |
| 06:30:56 | 06:39:52 | 08:56 |
| 06:39:58 | 13:42:12 | 07:02:14 |

J.A. at 233.

On February 16, Porter and Casey suspended Dixon pending an investigation into whether she had violated FedEx poli-

---

1. Because we conclude that Dixon is entitled to a new trial, we must necessarily vacate the award of discretionary costs to FedEx.

cy by falsifying her time records on February 6. Dixon denied that another employee signed her into the ACD and maintained that she was at work at 6:16 A.M. as the system records indicated. Dixon offered no explanation at that time as to why Porter first saw her at 6:40 A.M. Shortly thereafter, Porter and Casey completed the investigation into the events of February 6 and concluded that there was insufficient evidence of improper conduct to warrant Dixon's termination. Dixon returned to work on February 19.

At some time following Dixon's return to work, Sandra Sain, Dixon's co-worker, related to Casey that Dixon had boasted to her about how if Casey or Porter had checked the records at the security gate, they could have easily proven that Dixon was lying about being at work at 6:16 A.M. on February 6. Based on this new information, Casey and Porter reopened the misconduct investigation and this time inquired with the security manager, Dennis Lytle, if the gate records offered any information about when Dixon had arrived for work. Lytle sent Casey an e-mail stating that Dixon's daughter, Rochelle, signed the visitor log sheet at 6:32 A.M. as she dropped her mother off for work. J.A. at 256–57. Casey and Porter concluded that this information constituted concrete evidence that Dixon falsified her time records on February 6. Dixon could not have signed in at 6:16 A.M., they reasoned, because the security gate records proved she did not arrive onto FedEx's property until 6:32 A.M. Dixon was soon notified that her employment with FedEx was terminated.

On December 15, 1998, Dixon commenced the instant action in a Tennessee state court alleging wrongful discharge and employment discrimination based on gender in violation of Title VII, 42 U.S.C. § 2000e, and the Tennessee Human Rights Act, T.C.A. § 4–21–401(a)(1). FedEx subsequently removed this case, pursuant to 28 U.S.C. § 1441, to the United States District Court for the Western District of Tennessee.

## TRIAL JUDGE'S CONDUCT

■ A jury trial commenced on January 10, 2000, at which Dixon was represented by trial counsel Roger Rutledge with the assistance of Robert Armour. Dixon claims the district judge made disparaging remarks and engaged in conduct with regard to Mr. Rutledge which unduly burdened her right to a fair trial. Such a claim we would ordinarily review for abuse of discretion. *See Nationwide Mutual Fire Insurance Co. v. Ford Motor Co.*, 174 F.3d 801, 804 (6th Cir.1999) ("We review a district judge's conduct during a trial for an abuse of discretion.") (citation omitted). However, because Dixon did not raise an objection to the trial judge's conduct in the proceedings below, our review is for plain error. *Rocha v. Great American Insurance Co.*, 850 F.2d 1095, 1099 n. 1 (6th Cir.1988).[2] "Plain errors are limited to those so objectionable that they should have been apparent to the trial judge or that strike at the fundamental fairness, honesty, or public reputation of the trial." *United States v. Rodriguez*, 882 F.2d 1059, 1064 (6th Cir.1989).

**2.** In *Rocha*, we observed that "[w]here a trial judge's comments were so prejudicial as to deny a party an opportunity for a fair and impartial trial, the absence of objections will not preclude our review since counsel will be loathe to challenge the propriety of a trial judge's utterances for fear of antagonizing him and thereby prejudicing a client's case. Although not precluded, appellate review is limited to review for plain error." *Id.* (citation and internal punctuation omitted).

In her brief, Dixon takes issue with several remarks made and actions taken by the district judge during the course of the trial. In evaluating the effect of these comments, we must consider the entire record, not isolated remarks. *Newman v. A.E. Staley Manufacturing Co.*, 648 F.2d 330, 334–35 (5th Cir.1981). Nevertheless, Dixon relies in large part upon three particular events in support of her claim that she was denied a fair trial.

## 1. Trial Judge's Comments to Witness Sain

■ Sandra Sain appeared as a witness for FedEx and gave testimony which discredited Dixon's claim that she had arrived on time for work on February 6. After her testimony was completed, the district judge excused the jury and the following exchange took place:

> THE COURT: Ms. Sain, thank you for being here. I want to also tell you something which is—I wanted the jury not to be here and let everybody sit down. It is nice to have somebody here who is so concerned about integrity, and I think that is commendable in today's society. A lot of folks think that by breaking the rules or bending the rules or covering for a friend that is somehow the right thing to do in the workplace, and it is not. And I hope that people recognize the fact that it is hard to do what you have done. Everybody criticizes you, and people in the office, some of them get kind of mean about that sort of thing. I bet that is true, is that right?
>
> WITNESS: Yes, sir.
>
> THE COURT: Let me tell you, it happens to judges, too. If you do what you're supposed to do, there are a lot of folks who don't like it. There are probably a lot of other people who probably ought to say something about it and

they don't, but I'm a United States district judge, if that means anything at all, I want to say thank you. I hope every citizen will take a lesson and learn that all you have tried to do is do what is right; is that a fair statement?
>
> WITNESS: Yes, sir.
>
> THE COURT: And it hasn't been that easy, is that right?
>
> WITNESS: No, sir.
>
> THE COURT: And ·everybody in the company ought to understand that and say there is somebody who tried to do the right thing even when it wasn't easy to. So I appreciate you being here. I want to say thanks very much.

> \*　　\*　　\*　　\*　　\*　　\*

> THE COURT: [F]olks, you know, in our society we have got to put a premium on honesty and integrity and we have got to stop putting a premium on covering up for your friends. I don't know what happened here, and I'm sure as heck sorry that Mrs. Dixon lost her job after fifteen years, and the jury is going to decide the issue on gender discrimination, but we ought to praise people for trying to do the right thing.

J.A. at 346–48.

Dixon holds up this exchange between the trial judge and a material witness as evidence the judge was biased and had prejudged the merits of her employment discrimination claim. While it is unmistakable that the district judge believed Sain's testimony was truthful (and therefore that Dixon's testimony was untruthful), we decline to vacate the jury's verdict on the basis of these statements which were made out of the jury's presence. We have previously observed that "[m]uch of the concern about an otherwise inappropriate judicial act or remark is neutralized by the absence of the jury." *United States v. Morrow*, 977 F.2d 222, 225 (6th Cir.1992). In

reviewing a similar remark made by a district judge out of the jury's presence, the First Circuit Court of Appeals stated that "[j]udges are not expected to refrain from forming opinions about witnesses' credibility—how else would a judge be able to decide a case or pass on a motion for a new trial?—and the mere fact that the judge voices his opinion out of the presence of the jury does not irretrievably taint the trial." *Logue v. Dore,* 103 F.3d 1040, 1046 (1st Cir.1997) (citation omitted).[3] We have nevertheless taken into account the trial judge's comments to witness Sain in our decision to assign this case to a different district judge upon remand. *See Rivas v. Brattesani,* 94 F.3d 802, 805 n. 1 (2d Cir.1996).

The following events, however, are certain to have influenced the jury's view with regard to the merits of the case such that the jury was unable to perform its function of independent factfinder.

## 2. Courtroom Marshal Incident

■ After the following exchange, the district judge allowed Rutledge to proceed but ordered the uniformed courtroom marshal to sit or stand next to Rutledge at the examination podium "in case we have a problem." J.A. at 301.

> MR. RUTLEDGE: So sometime after that E-mail that we just looked at a moment from security and before on or about March 2nd, 1998, you took all of this information that we have heard about and formed the conclusion that led to the decision, your decision to terminate Barbara Dixon; is that a fair statement?
>
> WITNESS: Yes, Sir.

MR. RUTLEDGE: All right. Prior to that E-mail, as I understand your testimony, you would not have done anything?

WITNESS: I would have counseled her.

MR. RUTLEDGE: Well, I think you testified about that. After she came back from work, I think you testified that you had been away—

THE COURT: Arguing with the witness. It sounds like you're arguing with the witness—

MR. RUTLEDGE: No, it's—

THE COURT: Let's go to the question, counsel, and we don't need an argument with the witness.

MR. RUTLEDGE: It is just preface, Your Honor.

THE COURT: Counsel, come around to side-bar.

MR. RUTLEDGE: Your Honor, I decided—

THE COURT: Come around to side-bar, please, sir.

Gene?

(The following proceedings had at sidebar bench.)

THE COURT: I'm going to have Mr. Miller stand beside you, if you want won't do what I tell you to do. You have persistently gratuitously said things like that's okay, Your Honor. The second thing is that when you want to make a speech and then when I cut you off, you make another speech, you do that one more time and we're going to stop for the day and you're going to have to pay a substantial fine for contempt of court; is that perfectly clear? Do you understand?

**3.** In *Logue,* the First Circuit reviewed a claim of judicial bias arising out of the conduct of a district judge who excused the jury and then stated: "I just want to put it on the record that I totally disbelieve the plaintiff in this case. I think he's an absolute and incorrigible liar." *Id.*

MR. RUTLEDGE: Your Honor, I perfectly understand what the Court is saying.

THE COURT: Do you understand that it is inappropriate for you to continue to do what you have been doing, to pontificate from the examination podium just because you want to put yourself in a more favorable light? You cannot do that. I have been very patient in this case, I have been very patient in this case, and you just cannot continue to do that. Do you understand that? Do you understand that?

MR. RUTLEDGE: I do understand.

THE COURT: I will let you back to that station and Mr. Miller is going to be right over there sitting next to you, and if you do this again, we're going to stop for the day, and I don't expect you to continue to talk because I can't run a courtroom while you do this sort of thing.

　　*　　*　　*　　*　　*　　*

MR. MILLER: Did you want me sitting back there?

THE COURT: Yes, sir, in case we have a problem.

J.A. at 298–301.

### 3. Trial Judge's Threat and Subsequent Removal of Rutledge

Early in the trial proceedings, the district judge threatened to "kick[ ] [Rutledge] out of the game" when it appeared that Rutledge was, despite an earlier warning, arguing with the court's evidentiary rulings in front of the jury. The district judge later made good on this threat when he expelled Rutledge from the courtroom when Rutledge pursued a line of questioning the court believed violated the Rules of Professional Responsibility.

MR. RUTLEDGE: And following that period of time, did you ever have occasion to observe yourself personally with your own eyes any other person working in the position or place occupied by your sister Barbara, and doing her work?

MS. PALMER: Your Honor, objection, lack of personal knowledge.

THE COURT: Both question on relevance and personal knowledge, and so objection sustained.

MR. RUTLEDGE: I want to make sure I understand, Your Honor. If she observed—

THE COURT: If you want to talk about it come to the side-bar.

MR. RUTLEDGE: Thank you, Your Honor. Can we do that?

THE COURT: No, I'm not inviting you to the side-bar. If you want to talk about it, come to the side-bar because there's a rule against speaking motions. That means that a lawyer—if they want to say objection, fine. Most of the time, we have got a pretty good idea what the objection is. I usually rule on it. It is kind of like fouls that sometimes basketball players help the official call, but once they have—once they started, the official makes the call, so most of them are not speaking. If you get into a speaking motion with the basketball official, what happens to you? *You run the risk of getting kicked out of the game, exactly, or at least having another—a technical called on you because you won't be quiet because they're talking, and that's how it works here.*

J.A. at 201–02 (emphasis added).

MR. RUTLEDGE: Okay. And isn't it true that in this kind of bridge period between the third shift and the first shift, when most of the people come on the first shift that an individual can be working traces for other agents that are not assigned to them?

WITNESS: That's a possibility, yes.

MR. RUTLEDGE: And if that were the case, it wouldn't show up on your—

THE COURT: Counsel, let's talk about this at side-bar.

(The following proceedings had at side-bar bench).

THE COURT: Do you contend that there's testimony by your client that she was engaged in working other traces at that time?

MR. RUTLEDGE: That's what my client has stated in the testimony, Your Honor. As I understand, she could be working traces that were—

THE COURT: Did she—no, no, are you saying that on February the 6th, 1998 between 6:16 and 6:40 your client was engaged in working traces other than those assigned under her number, are you saying that your client has said that?

MR. RUTLEDGE: I don't believe that she has said it specifically that way, Your Honor.

THE COURT: Has she said it any way at all? Is it your testimony that your client has given us information that would lead us to believe intentionally that she was, in fact, doing that, is that your position?

MR. RUTLEDGE: It is the plaintiff's—

THE COURT: This is important because I hope you understand there may be a referral for various action, so you may want to get your answer the way you want it.

MR. RUTLEDGE: Well, Your Honor, I don't like to be in terrorem you will in court, but I'm trying to do my best, but it is the plaintiff's—

(The following proceedings were had in open court).

THE COURT: Ladies and gentlemen, we're going to take our lunch break.

I'm going to ask you, can you make it 45 minutes . . . .

(Jury out).

THE COURT: Would you want to repeat what you said about being in terrorem? You want to explain what you mean by that?

MR. RUTLEDGE: Well, the threat of a disciplinary charge.

THE COURT: That's not the only possibility here. Your client can be referred for perjury.

MR. RUTLEDGE: I understand.

THE COURT: And you're saying to me that your client has made that statement. If she made that statement, we can refer her to the grand jury for indictment for perjury. We went over this DR sometime ago, 7–106(C)(1) and (2). Is it your statement that you have testimony—that there is testimony in this record or that will be—that there will be admissible evidence in this case that your client . . . performed traces at the International Trace division of Federal Express on non-Q traces . . . ?

MR. RUTLEDGE: Your Honor—

THE COURT: Tell me your answer.

MR. RUTLEDGE: May I ask a question first?

THE COURT: You can go get—you can go get a lawyer to represent you. If you're afraid, you can take the Fifth Amendment, if you want to.

MR. RUTLEDGE: I'm a little afraid—

THE COURT: Take the Fifth Amendment if you don't want to.

MR. RUTLEDGE: I respect the Court, but I just—

THE COURT: Counsel, let me be real clear. You answer that question or you send somebody up here who will.

MR. RUTLEDGE: If I'm off base as far as the relevance, Your Honor—

THE COURT: It is not relevance, it is whether there's ever going to be proof

on this point that you're inquiring about. . . . Do you have information in this record or that you intend to present that your client engaged in tracing anything from February—from 6:16 to 6:40 on February the 6th?

MR. RUTLEDGE: The specific answer to that question is no.

THE COURT: Well, then you can't continue to engage in this line of inquiry because it constitutes a violation of the Canon of Ethics.

\* \* \* \* \* \*

THE COURT: Well, then let's do it. We're going to take our lunch break and you cannot continue this line of inquiry, and I will refer this matter to the Board of Professional Responsibility, because despite a previous warning of the Court, you resumed a line of inquiry as to which you have no evidence and as to which you intend to present no evidence, and in fact, as to which you have evidence to the contrary, and that is a violation of the Canons of Ethics. And when I talk to a person out here and I tell them they have to tell the truth and then the lawyer doesn't follow the rules, that's the problem in our society. I expect you to follow the rules. We are adjourned. You may come back in 45 minutes. We are adjourned. You are excused, and I'm going to talk to your partner to resume the examination when we come back because you are in contempt of court. Be prepared to resume the examination when we come back, Mr. Armour, you understand?

MR. ARMOUR: I understand.

THE COURT: You are dismissed, counsel.

J.A. at 380–86.

We do not intend to second guess the trial judge's view as to what action was necessary to maintain courtroom decorum and respect for the ethical rules, but it is not at all clear that Rutledge's conduct was in violation of the disciplinary rules. FedEx maintained that the ACD records showed that, although Dixon claimed to have clocked in at 6:16 A.M., no traces work was performed under her employee code number until 6:40 A.M. FedEx contended that given the heavy volume of calls handled by the International Trace department, it was inconceivable that an employee would go thirty minutes without a single phone call.

Dixon explained, however, that the ACD routinely forwards to active stations calls that have initially gone to the work station of a customer service agent who is unable to take the call. If another employee handles a forwarded call, Dixon explained, the ACD nevertheless credits that call to the employee to whom it was initially distributed. In that event, the employee who actually performed the work does not receive credit under her employee code number. It was Dixon's contention at trial that she could not remember what traces she worked the morning of February 6, but that she believed she handled a trace for co-worker Rita McKinney during the period in question. J.A. at 387. In that regard, there was indeed evidence (in the form of Dixon's testimony that she may have performed a trace for another service representative, but for which she did not receive credit) to support the line of inquiry pursued by Rutledge.[4]

It follows then that the removal of Rutledge was a rather drastic act by the district judge in light of the circumstances presented. More important, however, is the effect this and other actions by the trial judge doubtless had on the jury's ability to impartially weigh the evidence. In *United States v. Hickman*, 592 F.2d 931

---

4. In making this observation, we say nothing with regard to the credibility of such evidence, as this is the exclusive function of the jury.

(6th Cir.1979), we observed that "a trial judge's position before a jury is overpowering.... His position makes his slightest action of great weight with the jury." *Id.* at 933 (citations and internal punctuation omitted). As a result, it is incumbent upon the trial judge to make certain that any corrective action taken during the trial is carefully measured to avoid the appearance of hostility or partiality before the jury. In *Hickman,* we stated that "[a]ssuming that a trial judge has good reason to interject himself into the trial, the manner in which he does so is crucial.... [A]n objective demeanor is important. Outright bias or belittling of counsel is ordinarily reversible error." *Id.* at 934.

In this case, the jury heard the district judge's unsubtle threat, spoken in open court on the second day of trial, to kick Rutledge "out of the game." J.A. at 201–02. The jury witnessed the spectacle of Rutledge having to proceed with the uniformed courtroom marshal behind him. J.A. at 298–301. The jury witnessed the final testy exchange at side-bar between the trial judge and Rutledge and later returned to see that he had disappeared from the courtroom without explanation. On top of this, the trial judge allowed Mr. Armour, as replacement counsel, a mere forty-five minutes to prepare to undertake the examination of four remaining FedEx witnesses in addition to closing argument. At this point, Dixon certainly faced an uphill battle in light of the fact that Armour had no prior experience in a trial of a Title VII case, and indeed, no previous appearances in federal court.

We reject FedEx's argument that, at bottom, Dixon presented a weak and unpersuasive claim of employment discrimination, such that any inappropriate conduct by the district judge resulted in harmless error. The harmless error analysis is not applicable here. We have previously observed that the harmless error doctrine is inapplicable in cases where the trial proceedings have been tainted by the appearance of judicial bias or hostility. *See Nationwide Mutual,* 174 F.3d at 808; *Anderson v. Sheppard,* 856 F.2d 741, 746 (6th Cir.1988).

### CONCLUSION

On the whole, we cannot say that Dixon received a fair opportunity to persuade the jury in the proceedings before the district judge. His conduct with respect to Rutledge undoubtedly left an indelible impression on the jury that Dixon's discrimination claim was not meritorious. Accordingly, we vacate the jury's verdict and remand for a new trial before a different district judge.