# United States Court of Appeals
## For the First Circuit

No. 08-1547

UNITED STATES OF AMERICA,

Appellee,

v.

JOSE VALDIVIA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Lipez, Siler[*] and Howard,
Circuit Judges.

Rachel Brill for appellant.
Warren Vazquez, with whom Rosa Emilia Rodriquez-Velez, United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division and Thomas F. Klumper, Assistant United States Attorney, were on brief, for the appellee.

May 16, 2012

---

[*]Of the Sixth Circuit, sitting by designation.

**HOWARD, Circuit Judge**.   Following a jury trial, defendant-appellant José Valdivia was convicted of conspiracy to possess with intent to distribute one or more kilograms of heroin, 21 U.S.C. §§ 841, 846, and conspiracy to import one or more kilograms of heroin into the United States, 21 U.S.C. §§ 952(a), 963, for which he was sentenced to 210 months' imprisonment.   On appeal, Valdivia contends that the district court committed a litany of errors in (i) denying his motion to dismiss pursuant to the Speedy Trial Act; (ii) making inappropriate comments during trial and providing the jury with misleading instructions; (iii) permitting the government to present inadmissible hearsay and improper overview testimony; (iv) allowing a government fact witness to render expert testimony without the requisite qualification and advance notice; (v) denying multiple requests to suppress foreign wiretap evidence; and (vi) improperly applying the guidelines during sentencing.   After careful consideration of Valdivia's claims, we affirm the judgment below.

## I. Background

Drawing from the trial record, and excluding facts the significance of which may depend on the nature of the claim being raised, we recount the relevant factual background in the light most favorable to the verdict.   United States v. Gonzalez-Ramirez, 561 F.3d 22, 24 (1st Cir. 2009).   Due to the fact-specific nature

of Valdivia's array of claims, we reserve additional factual detail for the analysis that follows.

Between October 9, 2001 and April 30, 2003, Valdivia played an integral role in facilitating the distribution efforts of a substantial Aruba-based drug trafficking organization led by one José De Sousa. The scheme, insofar as concerns the prosecution of Valdivia, was relatively simple. De Sousa procured large shipments of heroin from Venezuela and Colombia, significant portions of which were diverted to Valdivia for distribution in Puerto Rico. The drugs were transferred in either of two ways: by strapping, swallowing, or otherwise affixing bags to traveling couriers; or by employing cruise line employees to deliver bicycles, the tires of which were laden with contraband. Valdivia, or his purported right-hand man, Carlos Pabón, obtained the deliveries and arranged for their sale and disbursement throughout the greater San Juan, Puerto Rico area. An associate of De Sousa -- typically his close confederate Jeffrey Grueninger -- would then make bi-monthly trips to collect the drug proceeds from Valdivia or Pabón. Grueninger, who testified for the government at Valdivia's trial, estimated that over the course of approximately eighteen months, Valdivia received upwards of 120-125 kilograms of heroin from De Sousa, at an estimated total street value of roughly $5 million.

The operation began to unravel in October 2001, when Giovani Castro -- a drug courier for De Sousa, and later a key

government witness at Valdivia's trial -- was seized in the San Juan airport, arriving from Aruba with approximately one kilogram of heroin strapped to his legs. Also discovered in his possession was a piece of paper containing two phone numbers -- both annotated with the subscript "José" -- which Castro claimed were provided to him by José Valdivia in order to arrange delivery of the drugs. A review of the phone records revealed that one of the numbers, while registered to a female subscriber, retained the user name of "José Valdivia."

Shortly after Castro's seizure, Aruban authorities initiated an investigation of the De Sousa drug network. They obtained approval from an Aruban court to wiretap De Sousa's telephones, resulting in the recording of several incriminating conversations between, among others, De Sousa, Grueninger, Valdivia, and Pabón. In January 2003, Grueninger was seized at the Miami International Airport with more than $27,000 in U.S. currency. A few months later De Sousa was arrested, and a subsequent search of his home by Aruban authorities yielded in excess of thirteen kilograms of heroin.

Valdivia was not long to follow; arrested in Puerto Rico on November 18, 2003, he was charged in a two-count criminal complaint with conspiracy to possess with intent to distribute, and import into the United States, one kilogram or more of heroin in violation of 21 U.S.C. §§ 841, 846, 952(a), and 963. A protracted

pretrial period ensued, during which both sides filed numerous motions, requested a host of conferences, and engaged in an extended series of unfruitful plea negotiations. Ultimately, at the conclusion of a twelve-day trial that commenced on February 6, 2006, Valdivia was convicted on both counts. This timely appeal followed.

## II. Analysis

### A. Speedy Trial Act

Valdivia first challenges the district court's denial of his motion to dismiss pursuant to the Speedy Trial Act (STA).[1] Ordinarily we review such a denial de novo as to legal rulings and for clear error as to factual findings. United States v. Maxwell, 351 F.3d 35, 37 (1st Cir. 2003). Here, however, although the parties wage a spirited battle over the applicability of the STA, we conclude in the end that Valdivia's STA claim has been waived, or at a minimum, forfeited.

The Speedy Trial Act requires that a criminal defendant's trial commence within seventy days from the filing of the information or indictment, or from the date of the defendant's initial appearance, whichever occurs later. 18 U.S.C. § 3161(c)(1). Failure to begin the trial within such time shall,

---

[1] Valdivia did not assert in the district court his Sixth Amendment right to a speedy trial, nor does he on appeal. He limits the scope of his argument to the statutory prescriptions of the Speedy Trial Act, 18 U.S.C. §§ 3161-3174, and we limit our analysis accordingly.

upon motion of the defendant, result in dismissal of the charging instrument either with or without prejudice. Id. § 3162(a)(2). The Act, however, excepts certain periods of delay from the STA's seventy-day clock. Two such exclusions hold particular relevance for this appeal.

The first, set forth in 18 U.S.C. § 3161(h)(1), requires the automatic exclusion of "[a]ny period of delay resulting from other proceedings concerning the defendant, including but not limited to" eight enumerated subcategories of proceedings.[2] Id. (emphasis added). Although § 3161(h)(1) exclusions often fall within the eight specifically listed subcategories, various non-enumerated delays have also been held to be automatically excluded by virtue of the non-limiting "other proceedings" clause. See, e.g., United States v. Anello, 765 F.2d 253, 256 (1st Cir. 1985) (holding that time spent engaging in collateral proceedings before another district judge attacking the lawfulness of grand jury selection procedures constituted "other proceedings"). The "other proceedings" language, however, is not a carte blanche for post-hoc determinations of excludability. In discerning whether a non-enumerated delay constitutes an "other proceeding," and therefore warrants automatic exclusion under the STA, several courts have imposed, or at least implied, some limiting restrictions. See,

_____

[2] For completeness, the full text of subsection (h)(1) is included in an appendix to this opinion.

e.g., United States v. Lucky, 569 F.3d 101, 107 (2d Cir. 2009) (requiring at least some semblance of "formal judicial process[]" to constitute an "other proceeding"); see also Bloate v. United States, 130 S.Ct. 1345 (2010) (holding that time granted to prepare pretrial motions is not automatically excludable as an "other proceeding" under § 3161(h)(1)).

The second relevant exclusion, § 3161(h)(7)[3] -- commonly referred to as the "ends-of-justice" provision -- permits the court to exclude delays resulting from continuances granted "on the basis of [the judge's] findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial."  18 U.S.C. § 3161(h)(7)(A).  As a permissive, rather than automatic, exclusion, the trial court is required to affirmatively "set[] forth, in the record of the case, either orally or in writing, its reasons" for granting an ends-of-justice continuance.  Id.  Such findings must be entered into the record by the time a district court rules on a defendant's motion to dismiss under the STA.  Zedner v. United States, 547 U.S. 489, 507 (2006).

In this case, 797 days elapsed between Valdivia's initial appearance on November 25, 2003, and the filing of his January 31,

---

[3] In October 2008, Congress re-designated this provision from 18 U.S.C. § 3161(h)(8) to § 3161(h)(7).  While the parties refer to the provision as § 3161(h)(8), we will use the current numbering to avoid the potential for confusion.

2006 motion to dismiss on STA grounds. See United States v. Hood, 469 F.3d 7, 9 (1st Cir. 2006) ("The [STA] clock . . . stops the day the defendant files a motion to dismiss for lack of a speedy trial."). Despite this labyrinth of pretrial activity, the parties agree that the bulk of this time is properly excluded from the STA calculation. They dispute the excludability of only two potentially dispositive spans of time, which can be broken down for present purposes as follows[4]:

### 1. August 21, 2004 - November 4, 2004

The district court held pretrial conferences on May 25, June 28, and August 6, 2004 to ascertain the status of ongoing plea negotiations. The minutes from the May 25 and June 28 conferences state, in relevant part, that the parties were granted thirty-day periods to finalize negotiations, and that the court would therefore "toll the speedy trial [act] until [the] next status conference." The minutes from the August 6 conference also allude to ongoing plea discussions and grant the parties additional time to negotiate. In contrast to the minutes from the two previous conferences, however, the August minutes do not explicitly refer to the Speedy Trial Act, noting only that another status conference would be scheduled for September 23, 2004. On August 20, a pending

---

[4] Because the government concedes that sixty-nine days between November 25, 2003 and January 31, 2006 are not excludable from the STA calculation, the inclusion of either of the proposed time periods would be dispositive to Valdivia's STA claim.

interlocutory appeal previously filed by Valdivia (the pendency of which had tolled the STA) was denied. Other than the continuation of plea negotiations, neither the parties nor the district court docket indicate any additional formal activity until November 5, 2004, when Valdivia filed a motion requesting a status conference, again tolling the STA clock.[5] See 18 U.S.C. § 3161(h)(1)(D). The parties dispute whether the period between the denial of the interlocutory appeal on August 20 and the November 5 filing of the motion for a status conference should be excluded.

### 2. November 10, 2004 - November 29, 2004

On November 9, 2004, the Court held another status conference pursuant to Valdivia's November 5 request. The minutes note in pertinent part that "[t]he government provided [a] copy of the plea agreement to the defense. [Defense counsel] will review and discuss the same with his client. Since the parties were negotiating a plea agreement in this case, the court has granted the defendant until November 29, 2004 to object [sic] Magistrate Judge's Report and Recommendation [] as to the motion for bill of particulars. . . ."[6] On November 29, 2004, Valdivia filed an

---

[5] For reasons unclear from the record, it appears that the pretrial conference scheduled for September 23, 2004 was never actually held.

[6] On March 10, 2004, Valdivia had filed a motion for a bill of particulars. On May 4, 2004, the magistrate judge recommended that the trial judge deny the motion. The government hints that the 209-day period between the issuance of the magistrate judge's report on May 4, and the filing of the defendant's objection on

objection to the magistrate's report and recommendation, which once more tolled the STA. See id. Here, the parties dispute the excludability of the time between the November 9 status conference and the filing of objections to the report and recommendation on November 29.

The government advances two theories for excluding these periods of delay. First, it proposes the application of § 3161(h)(7), arguing that the ends of justice served by tolling the STA for plea negotiations that occurred throughout the disputed periods outweigh the interests of according the defendant and the public a speedy trial. The problem with this argument is that there was no "ends-of-justice" finding entered into the record, despite the statute's requirement that such a finding be made by the trial judge. See § 3161(h)(7)(A); Zedner, 547 U.S. at 507. In constructing such a finding, the district court need not recite a formulaic incantation of the "ends-of-justice" language, but it must articulate clearly the reasons that support an ends-of-justice continuance. See Zedner, 547 U.S. at 506-07 (holding that "the Act requires express findings," and that a mere "passing reference to

---

November 29, might be excludable on the basis of this pending motion. It is not. See 18 U.S.C. §§ 3161(h)(1)(D), (h)(1)(H); United States v. Thomas, 788 F.2d 1250, 1257 (7th Cir. 1986) (holding that the speedy trial clock begins to run as soon as the magistrate judge files the report and recommendation, and tolls for up to thirty days, upon objection of either party, for the district court to take the matter "under advisement" pursuant to 18 U.S.C. § 3161(h)(1)(H)).

-10-

[a] case's complexity" would be an insufficient basis for an ends-of-justice continuance); United States v. Pakala, 568 F.3d 47, 60 (1st Cir. 2009) ("[A] district court must make on the record findings justifying the grant of any 'ends of justice' continuance.").

Here, it is far from clear that the limited STA references in the May 25 and June 28 pretrial conference minutes (and conspicuously absent from the August 6 and November 9 minutes) -- which respectively tolled the Act only until "the next pretrial conference" -- would function as an adequate basis for a § 3161(h)(7) exclusion of either of the contested periods between August 21 and November 29. Absent the requisite ends-of-justice findings, we may not apply § 3161(h)(7) retrospectively. See Zedner, 547 U.S. at 506 (rejecting the government's argument that the required ends-of-justice finding could be supplied ex post facto on remand).

As an alternative basis for exclusion, the government contends that plea negotiations constitute non-enumerated "other proceedings" pursuant to § 3161(h)(1). Thus, the government argues, because the parties engaged in sporadic plea negotiations between August 21 and November 29, 2004, the corresponding timeframes should be automatically excluded from the STA's seventy-day calculus. To the extent that other circuits have considered

the issue of whether plea negotiations fall within the ambit of § 3161(h)(1)'s "other proceedings" clause, they are divided.[7]

Although we have yet to squarely address this issue, it is not necessary for us to do so here, as Valdivia has waived, or at least forfeited, his STA claim. Generally, under the Act, a defendant's failure to move for dismissal of the charging instrument prior to trial "shall constitute a waiver of the right to dismissal." 18 U.S.C. § 3162(a)(2). While an issue not raised in the district court is typically reviewed for plain error on appeal, see Fed. R. Crim. P. 52(b), under the STA the failure to move to dismiss the indictment constitutes a waiver, rather than a forfeiture. United States v. Rodríquez-Durán, 507 F.3d 749, 768 (1st Cir. 2007); United States v. Spagnuolo, 469 F.3d 39, 45-46 (1st Cir. 2006).

Moreover, courts have held that even where a defendant timely files a motion to dismiss under the Speedy Trial Act, his failure to identify specific arguments will result in a waiver of those arguments on appeal. See, e.g., United States v. Seals, No. 10-4192, 2011 WL 6188699, at *2 (10th Cir. 2011) ("[W]e may not

---

[7] Compare United States v. Leftenant, 341 F.3d 338, 344-45 (4th Cir. 2003) (holding that plea negotiations trigger automatic exclusion pursuant to 18 U.S.C. § 3161(h)(1)); United States v. Van Someren, 118 F.3d 1214, 1218-19 (8th Cir. 1997) (same); United States v. Montoya, 827 F.2d 143, 150 (7th Cir. 1987) (same); United States v. Bowers, 834 F.2d 607, 610 (6th Cir. 1987) (same), with United States v. Alvarez-Perez, 629 F.3d 1053, 1058 (9th Cir. 2010) (holding that plea negotiations do not trigger automatic exclusion pursuant to 18 U.S.C. § 3161(h)(1)); Lucky, 569 F.3d at 107 (same).

conduct any review of Speedy Trial Act arguments unraised below, not even for plain error. . . . [N]ot only must the defendant seek dismissal [on STA grounds] prior to trial, but he must do so <u>for the reasons</u> he seeks to press on appeal."); <u>see also</u> <u>United States</u> v. <u>O'Connor</u>, 656 F.3d 630, 638 (7th Cir. 2011) (finding forfeiture at a minimum, but noting that "the text of § 3162(a)(2) -- read as a whole and in light of the [Supreme] Court's language in <u>Zedner</u> -- strongly suggests that violations not specifically identified in the defendant's motion to dismiss are waived, not forfeited"); <u>United States</u> v. <u>Oberoi</u>, 547 F.3d 436, 458 (2d Cir. 2008), <u>vacated & remanded on other grounds</u>, 130 S.Ct. 1878 (2010).

In the district court, Valdivia asserted in his pretrial motion to dismiss that an entirely separate 104-day period from October 26, 2005 through his trial date of February 6, 2006 was not excludable under the STA, a claim which the district court summarily denied, and that Valvidia now concedes. Nowhere in the motion did Valdivia identify the periods of time that he now purports to challenge as non-excludable; accordingly, there is a strong basis for finding the argument waived.[8]

Even if his challenge has not been waived, but merely forfeited, Valdivia cannot establish plain error. <u>See</u> <u>United</u>

---

[8] Nor may an argument be made that the issue was raised during trial, as such tardiness also results in waiver. <u>See</u> 18 U.S.C. § 3162(a)(2); <u>Zedner</u>, 547 U.S. at 506. The argument must be raised prior to trial, and there is nothing in the pretrial record to suggest that the appellant's current argument was timely proposed.

States v. Turbides-Leonardo, 468 F.3d 34, 38 (1st Cir. 2006) (forfeiture of an argument compels plain error review). As we have yet to address whether plea negotiations are automatically excludable under § 3161(h)(1), and there is no consensus among the circuits on the issue, we are not inclined to find that the district court's failure to identify, sua sponte, the violation that Valdivia presses before us was "clear or obvious," if error at all. See United States v. Marino, 277 F.3d 11, 32 (1st Cir. 2002) (declining to find plain error where the law was unsettled); United States v. Diaz, 285 F.3d 92, 97 (1st Cir. 2002) (where law on issue was unsettled in First Circuit and other circuits were split, error could not be deemed "plain"). Consequently, we reject Valdivia's Speedy Trial Act claim.

**B. Judicial Commentary and Jury Instructions**

The appellant next alleges that at various junctures, the district court inaccurately and prejudicially commented on the evidence, thus skewing the proceedings and depriving him of an impartial trial. Specifically, he contends that, in making several remarks during trial and in issuing instructions, the trial judge (1) bolstered the perceived strength of the government's case, (2) assumed the otherwise contested identification of Valdivia's voice on certain wiretap recordings, and (3) presaged the present appeal, thereby implying the judge's expectation of a conviction. We address these claims in turn.

-14-

## 1. Strength of the Evidence

As part of its case-in-chief, the government presented evidence -- including the testimony of a Drug Enforcement Agency (D.E.A.) chemist, and a copy of the chemist's forensic laboratory report -- to show that the substance possessed by Giovani Castro upon his arrest, and intended for delivery to Valdivia, was in fact heroin. Because the substance itself had been destroyed by the government prior to trial, defense counsel objected that the chain of custody was deficient, leading to the following exchange with the trial judge in front of the jury:

> Defense Counsel: The case against my client relies on [the drugs seized from Castro on October 9, 2001]. [. . .]
>
> Court: Partially. It does partially, because even if the drugs do not exist . . . there is plenty of other evidence here, if the jury believes it, to convict your client.
>
> Defense Counsel: [. . .] What can we do with [destroyed] evidence and . . . partial testimony?
>
> Court: Sir, if I eliminate the drugs [found on Castro], the case still goes against your client, based on the testimony of all the other witnesses. [. . .] And then the jury will decide.

The court then excused the jury at the government's request, and further explained:

> [T]o make matters very clear, even if the Court eliminates the [drugs found on Castro] and gives an instruction to the jury to disregard the transaction of [Castro], this case still goes to the jury because there was

> plenty of evidence provided by the cooperator
> that he provided heroin to . . . and collected
> from [Valdivia].

Upon its return, the jury was instructed that the chain-of-custody issue raised by defense counsel affected only the weight, and not the admissibility, of the chemist's testimony.

At the beginning of the next trial day, the judge prefaced his issuance of a lengthy superseding instruction by noting that, "last [trial day], . . . there was a discussion between counsel [and with the Court] as to the law . . . and I am going to . . . order you to disregard anything that you may have heard as to that discussion[,] and the instruction [from] that day is . . . superseded by this instruction. . . ." To eliminate any "created confusion," the court then proceeded to define the elements of criminal conspiracy, explaining in pertinent part:

> [S]ince overt acts are [no longer a] necessary [element of conspiracy], the . . . physical presence of drugs is not required, because that would be an overt act. [In] this case, however, the [government] has chosen to prove overt acts. <u>And there have been many overt acts allegedly testified</u>. And you will provide credible [sic], yes or no, as to those overt acts. And I am ordering that you . . . are not to decide credibility until the end of the case when you have all of the evidence in. <u>Examples of overt acts are the fact that drugs came in . . . tires of bicycles[,] . . . whether or not a person went to charge for the drugs, and whether or not a person went to deliver the drugs. All of those are overt acts</u>. [. . .] The defense can challenge [the overt acts], and it will be up to you to decide whether or not the [government] has proven [them].

-16-

(emphasis added). According to Valdivia, the judge's comments and the highlighted portions of the instructions fostered the impression that the court had prematurely concluded that the evidence was sufficient, effectively usurping the jury's ability to weigh it for proof of guilt. We disagree.

A trial judge is the "governor of the trial for the purpose of assuring its proper conduct, and has a perfect right - albeit a right that should be exercised with care - to participate actively [at trial]." Logue v. Dore, 103 F.3d 1040, 1045 (1st Cir. 1997) (internal citation omitted). Trial judges in the federal system thus retain the power to "analyze, dissect, explain, summarize, and comment on the evidence," so long as their participation is balanced, and does not render unfair advantage to either party. Id. Ultimately, an inquiry into the propriety of a judge's actions in this regard will turn on whether the complaining party can show serious prejudice. See United States v. González-Soberal, 109 F.3d 64, 72 (1st Cir. 1997).

After a painstaking review of the trial record, we conclude that the judge's actions did not amount to reversible error. As a preliminary matter, all of the challenged statements and instructions were provided with a single purpose in mind: to resolve any confusion caused by defense counsel's assertion, in the presence of the jury, that the unavailability of the substance in Castro's possession was somehow dispositive of the government's

case. The court was merely attempting to clarify the elements necessary for a finding of guilt. See United States v. Quesada-Bonilla, 952 F.2d 597, 600-01 (1st Cir. 1991) (failing to find prejudice in part because "defense counsel . . . provoked the court's comment").

There is little doubt that, in doing so, some of the language employed -- "there is plenty of other evidence . . . to convict your client," and "the case still goes against your client" -- if considered in isolation, could give a reviewing court some pause. But we cannot read such words as singular, insular statements; rather, we must gauge them in light of the overall record. Loque, 103 F.3d at 1046; United States v. Richman, 600 F.2d 286, 296 (1st Cir. 1979). Properly viewed in that broader context, the contested statements were contemporaneously tempered by qualifying language like "if the jury believes it" and "then the jury will decide," and any lingering untoward effects were almost certainly cured by the court's mandate to disregard the remarks, and its numerous and explicit reminders that the jury alone retains the exclusive function of judging the facts. See United States v. Candelaria-Silva, 166 F.3d 19, 36 (1st Cir. 1999) (holding that jury instructions are a useful means of allaying potential prejudice). Thus, the court's commentary, though in some instances perhaps inartfully constructed, did not substantially taint the proceedings.

We similarly fail to discern any error as to the substance of the court's curative instruction on the elements of conspiracy. The use of evidentiary exemplars from the body of existing trial evidence to illustrate the meaning of "overt acts" was not improper; we have repeatedly stated that the "trial judge is not limited to instructions in the abstract. The judge may explain, comment upon and incorporate the evidence into the instructions in order to assist the jury to understand it in light of the applicable legal principles." United States v. Maguire, 918 F.2d 254, 268 (1st Cir. 1990) (internal citation omitted). This is precisely what the court did: incorporate the evidence in order to explicate the governing law. In plumbing any other meaning, the appellant is most assuredly overreaching.

### 2. Voice Identification

The appellant's second claim of inappropriate conduct fares no better. Faced with the proffer of recordings from the Aruban wiretap investigation, defense counsel objected, questioning the authenticity of the tapes and submitting that there was insufficient foundational proof that the voice was indeed that of the defendant. The court, in addressing the objection at some length, made the following remark before the jury, which the appellant now urges must result in vacating his conviction:

> Whether [the tapes are] going to be played to
> the jury, remember what I said, please . . . .
> The jury is not going to hear any of this
> until I'm satisfied that those tapes contain

-19-

> Mr. Valdivia, and whether or not I can -
> somebody can identify his voice.

(emphasis added).  Valdivia submits that the court's subsequent admission of the recordings, in conjunction with this statement, left the jury with little choice but to conclude that the voice on the tapes belonged to him.

As noted above, in determining the prejudicial effect of such a statement, we review it not independently, but as part and parcel of the record in its entirety.  Logue, 103 F.3d at 1046; Richman, 600 F.2d at 296.  That record, upon closer inspection, divulges meaningful pieces of the exchange that were omitted from the appellant's brief.  For example, almost immediately prior to the contested statement, the court opined:

> [T]his Court . . . will not allow any arguments, relating to any other tape but the tape of Mr. Valdivia if somebody identified the voice of Mr. Valdivia.  So whatever happened that may be in that tape . . . relating to any other person other than Mr. Valdivia, . . . I'm not going to allow [it]. [. . .]  [T]he only tapes [to] be played and produced in evidence will be the tapes of the Defendant if somebody . . . properly identified the tapes of the Defendant.  [. . .]  [T]he only case I have is if somebody identifies the tapes, that this José Valdivia is him.  And I don't know if it will be, because it will be the jury that will decide if the voice identification made is reliable to them.  It's not going to be me, it's going to be ultimately the jury.

(emphasis added).  A short time later, the court continued:

> [T]he Court admits the tape, subject to the weight the jury may provide because . . . the

-20-

> fact that the Court accepts a document does not mean that you have to provide it weight. The weight will depend on the credibility and the defendant may attack the weight of the [tape]. [. . .] The Defendant is not precluded and can challenge the . . . tape.

These statements, and the court's many admonitions to reserve judgment until all of the evidence had been presented, were enough to ameliorate any perceived impropriety.  See Richman, 600 F.2d at 296 (holding that similar instructions to the jury "effectively cured whatever error had been made").[9]

### 3. Predicting the Appeal

The appellant's final charge of prejudicial commentary, which he raises for the first time on appeal, need not detain us. Confronted on several occasions with the need for English translations, the court noted that such translations were required "for appeal purposes," and reflected on the importance of "making a proper record for appeal."  The appellant's brief is devoid of any developed argumentation on the issue, offering only an oblique suggestion that, "in conjunction with the other prejudicial remarks," the comments "warrant closer consideration."  Such sparse elaboration falls far short of the development required for consideration on appeal, and we could reject the claim on this ground alone.  See United States v. Zannino, 895 F.2d 1, 17 (1st

---

[9] We note that the far more preferable forum for these types of exchanges is the sidebar conference, through which virtually any risk of prejudice could have been easily avoided here.

Cir. 1990) (holding that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

Moreover, the record here reflects a wholly rational explanation for the court's references. As we have said, "it is clear, to the point of transparency, that federal court proceedings must be conducted in English . . . . [And] parties are required to translate all foreign language documents into English." United States v. Rivera-Rosario, 300 F.3d 1, 5, 7 n.4 (1st Cir. 2002). Normally, the submission of foreign documents unaccompanied by English translations is error, and such documents would not be considered on appeal. See United States v. Contreras Palacios, 492 F.3d 39, 43 n.7 (1st Cir. 2007). The court, in neutrally referencing the preservation of the record, was merely explaining to the jury the significance of the translations in light of these stringent rules. Such comments were not impermissible, let alone prejudicial.

### C. Hearsay, Overview, and Bolstering Testimony

In the first of several evidentiary challenges, Valdivia contests the admission of certain testimony from three of the government's primary witnesses: Immigration and Customs Enforcement agent Eliú Estrada, who interrogated the courier Giovani Castro after his October 2001 arrest; D.E.A. agent Vincent Carpio, who supervised the American investigation of Valdivia's activities; and

Jan Meulenberg, the Aruban officer who spearheaded the De Sousa wiretap operation. We review the preserved challenge to Estrada's testimony for abuse of discretion, but because the appellant failed to raise contemporaneous objections to the statements of Carpio and Meulenberg, we review the court's decision to admit that testimony only for plain error. See United States v. Brown, Nos. 09-2402, 10-1081, 2012 WL 149484, at *7 (1st Cir. January 19, 2012). If any of the identified testimony was improperly admitted, we may still "affirm [the] judgment of conviction where the government has met its burden of showing that any such error was harmless beyond a reasonable doubt." United States v. Cabrera-Rivera, 583 F.3d 26, 36 (1st Cir. 2009) (internal citation omitted).

### 1. Testimony of Agent Estrada

On the first day of trial, Agent Estrada provided a comprehensive account of Castro's arrest, which included several of Castro's post-arrest statements. For example, as recounted by Estrada, Castro "explained that he [had been] approached in Aruba by an individual called . . . José, to see if he wanted to bring some narcotics into the United States," and provided authorities with a detailed description -- reproduced by Estrada on the stand -- of the process by which he was fitted for and supplied with the drugs for delivery to Valdivia. The appellant now contends, as he did below, that this testimony constituted inadmissible hearsay, which the trial court erroneously admitted under the co-conspirator

-23-

exception to the hearsay rules.  See Fed. R. Evid. 801(d)(2)(E) (providing that a statement will be excluded from the rules of hearsay where it "was made by the party's co-conspirator during and in furtherance of the conspiracy").

The government concedes the point, acknowledging that the statements were not made in furtherance of the alleged conspiracy. Instead, the government makes a somewhat strained argument that the testimony was admissible for the non-hearsay purpose of providing context or background to show the basis for the government's actions.  Put another way, the government would have us believe that it meant for the jury to take Castro's statements, as recalled by Estrada, only for the fact that he made them, and not for their truth.  We need not reach the merits of the government's alternative argument, however, because we find that the admission of this material, if erroneous, was harmless error.

Even if the challenged testimony was inadmissible hearsay, the source of the out-of-court statements -- Giovani Castro -- later testified himself, and was subject to thorough cross-examination by defense counsel.  He largely corroborated Estrada's account, repeating many of the same details, and the few discrepancies were adroitly incorporated by the defense to undermine the credibility of both witnesses.  In short, the purported hearsay testimony is cumulative of other evidence in the record, and the error in admitting the statements under the co-

conspirator exception was harmless.  See United States v. Piper, 298 F.3d 47, 58 (1st Cir. 2002) ("Cumulative evidence is typically regarded as harmless.").

### 2. Testimony of Agent Carpio and Officer Meulenberg

In a quite different claim of error, Valdivia relies on several of our recent cases to assert that various statements from witnesses Carpio and Meulenberg amounted to improper "overview" testimony.  See, e.g., United States v. Meises, 645 F.3d 5 (1st Cir. 2011); United States v. Flores-De-Jesús, 569 F.3d 8 (1st Cir. 2009); United States v. Casas, 356 F.3d 104 (1st Cir. 2004). Because the argument was not preserved below, we review it now through the lens of plain error.[10]  See United States v. Andújar-Basco, 488 F.3d 549, 554 (1st Cir. 2007).  To prevail under this standard, the appellant must demonstrate that there was a clear or obvious error that seriously affected not only his substantial rights, but also the fairness, integrity, or public reputation of the judicial proceedings.  Id.

In its problematic form, overview testimony comprises declarations by a witness -- most commonly a law enforcement officer involved in the relevant investigation -- presented in the early phases of a criminal trial to describe the government's

---

[10] Although the record was peppered with objections by defense counsel, we are unable to identify any objection to this testimony on the "overview" grounds now presented on appeal.  Absent a contrary indication by the appellant, we therefore deem the argument forfeited, and review it for plain error only.

general theory of the case. See United States v. Vázquez-Rivera, 665 F.3d 351, 356 (1st Cir. 2011); Meises, 645 F.3d at 14 n.13 (noting that such evidence "often provides an anticipatory summary of the prosecution's case by previewing the testimony of other witnesses"). Because the witness is, in essence, testifying about the results of a criminal investigation before the government has presented any evidence -- often including aspects of the investigation in which he did not actually participate -- we have repeatedly admonished the use of such testimony. United States v. Rosado-Pérez, 605 F.3d 48, 55 (1st Cir. 2010). Specifically, we have cautioned that "the evidence promised by the overview witness [might] never materialize[]," and that even if it does, the testimony still "represents a problematic endorsement of the veracity of the testimony that will follow." Vázquez-Rivera, 665 F.3d at 356 (internal citation omitted).

Although the questionable use of overview witnesses has become something of a troubling trend, see Flores-De-Jesús, 569 F.3d at 17, the declarations at issue here are largely distinguishable from those that we have previously considered problematic. On the second day of trial, Agent Carpio testified that "De Sousa was bringing drugs into the island of Aruba for further distribution into different areas in the Caribbean, including the United States, Puerto Rico, and Europe," and was "smuggling the proceeds . . . back [to] Aruba." In a similar vein,

halfway through trial, Officer Meulenberg testified that he "was the leader of the group that . . . investigat[ed] a group of persons led by [De Sousa]," and explained that "[De Sousa] was . . . buying drugs in Colombia and Venezuela and selling drugs, not only to the local market but to the American . . . and European market[s]." He also testified that the potential involvement of an airport security guard, a cruise-ship official, and a police officer in the suspected criminal activities was a major impetus for the investigation.

Unlike prior cases where we have criticized the use of overview witnesses, the prosecution here laid a sufficient foundation that both Meulenberg and Carpio had personal knowledge of the alleged conspiracy. Officer Meulenberg testified that he led the Aruban investigation of drug activity involving De Sousa, assisted in preparing the report submitted to obtain the Aruban wiretap, participated in wiretap surveillance, and conducted the arrests and home searches of several of the conspiracy's participants, including De Sousa. Similarly, Carpio testified that he was the American liaison to the Aruban investigation, that he reviewed the wiretap recordings and pertinent telephone records, which were ultimately entered into evidence, and that he had conducted his own independent investigation of Valdivia's role in De Sousa's activities. Thus, far from being a scripted "overview" of the government's case by uninvolved agents, the testimony

-27-

represented the fruits of first-hand police work.  See <u>Rosado-Pérez</u>, 605 F.3d at 55-56 (concluding that the prosecution had laid a sufficient foundation of personal knowledge where the testifying agent "was the lead investigator . . . and . . . participated in video and personal surveillance, wiretap surveillance, and controlled drug buys").

To the extent that Carpio and Meulenberg described the cast of characters as an "organization" or "group" -- a characterization, as we have noted, to which the appellant did not object -- any misstep was heavily outweighed by the substantial evidence of the appellant's guilt, which included wiretap recordings, phone records, and co-conspirator testimony, among other things.  <u>See, e.g.</u>, <u>Flores-De-Jesús</u>, 569 F.3d at 27-31 (finding the use of overview testimony ameliorated in part by the substantial evidence of defendant's guilt).  As such, we find that the admission of this testimony was not plainly erroneous.

### 3. Bolstering

On three occasions during the government's case, the prosecutor elicited testimony from agents Estrada and Carpio that they had "corroborated" or "verified" various aspects of their investigation, including the content of certain statements made by co-conspirators Giovani Castro and Jeffrey Grueninger.  Although Valdivia failed to properly object to this testimony at trial, he now contends that it constituted a form of due process violation

known as bolstering. The argument, for the reasons elucidated below, is unavailing.

Generally, "[b]olstering occurs when [a] prosecutor implies that [a] witness's testimony is corroborated by evidence known to the government but not known to the jury." United States v. Francis, 170 F.3d 546, 551 (6th Cir. 1999); see also United States v. Balsam, 203 F.3d 72, 88 (1st Cir. 2000) (noting that a prosecutor may not "indicate that facts outside the jury's cognizance support the testimony of the government's witnesses"). While prosecutors can commit improper bolstering during argument to the jury, the issue may also arise through the testimony they elicit from other government witnesses on direct examination. United States v. Rosario-Díaz, 202 F.3d 54, 65 (1st Cir. 2000). Here, the appellant asserts that the contested statements improperly bolstered the prosecution's case by suggesting to the jurors that the government had undisclosed evidence which independently supported the existence of the charged conspiracy. Because the evidence underlying each of the three purported instances of bolstering was ultimately presented to the jury, however, the testimony did not run afoul of Valdivia's due process rights. We explain briefly.

In the first instance, Agent Estrada testified that he was able to "corroborate" that the "José" identified by Castro as his point of contact in Puerto Rico was indeed José Valdivia. This

corroboration, he explained, was enabled in part by information obtained from subpoenaed phone records, which were subsequently entered into evidence. In the second instance, Estrada later testified that during the course of the investigation, he was able to "determine" that two different men named "José" were pertinent to the conspiracy. The sources for this determination, which can be divined from the surrounding testimony -- including phone records and information from at least one witness -- were later presented for the jury's consideration. In the third and final instance, Agent Carpio testified that "[a]fter the arrest of [Jeffrey] Grueninger in Miami, we were able to debrief him and help him identify the voices on the [Aruban wiretap tapes], and that's how we obtained the identification of Mr. Valdivia later on, how we were certain who he was." The recordings to which Carpio alluded were all played for the jury.

In order for a criminal defendant to establish a colorable claim of bolstering, the challenged statements must do more than simply "bolster" the government's case. Criminal prosecution is, after all, nothing more than the use of evidence to bolster the government's allegations of criminal conduct. The potential for impropriety emerges only when such bolstering is predicated upon unsubmitted evidence, thereby implying some indicia of reliability on the basis of materials that may or may not exist. See Francis, 170 F.3d at 551 (noting that "bolstering" occurs under

the implication that "testimony is corroborated by evidence known to the government <u>but not known to the jury</u>") (emphasis added). Here, in every instance, the evidence supporting the "corroborat[ions]" and "determin[ations]" was eventually put before the jury.  Thus, whatever objections Valdivia might have been able to raise against these lines of questioning, bolstering is not one of them.

To the extent that the appellant alternatively characterizes this challenged testimony as improper witness vouching, the argument misses the mark.  A prosecutor (or government witness) improperly vouches for a witness when she "impart[s] her personal belief in a witness's veracity or impl[ies] that the jury should credit the prosecution's evidence simply because the government can be trusted."  <u>United States</u> v. <u>Pérez-Ruiz</u>, 353 F.3d 1, 9 (1st Cir. 2003).  The conduct of the witnesses here does not fit the bill.  They did not testify that Castro and Grueninger were truthful, honest, or reliable, or that their statements should be believed because of their affiliation with the government.  Rather, they confirmed, through independent sources, the veracity of certain facts attested to by the cooperating witnesses, conduct that is conceptually distinct from witness vouching.[11]

---

[11] The term "bolstering" has, on occasion, also been used as a shorthand for the concept of improper witness vouching.  Despite some conceptual overlap, the proscription on improper witness

## D. Agent Carpio's Lay Witness Testimony

During trial, the government introduced evidence linking Valdivia to one of the two phone numbers found in Giovani Castro's possession at the time of his arrest, which referenced only the name "José." That evidence included, inter alia, testimony from the issuing phone company's custodian of records, who explained that while the account's subscriber was an inconsequential third party, its registered user name was in fact "José Valdivia."

In an effort to undermine this link to his client, defense counsel subsequently cross-examined Special Agent Carpio concerning the fact that a second phone number, found in the possession of another of De Sousa's couriers, was ascribable to a "José" with a different surname -- one José Camilo. On redirect examination, the prosecutor and Carpio engaged in the following colloquy over the objection of defense counsel:

> Prosecutor: According to your experience as a narcotics investigator, how . . . does a telephone number registered in the name of a person compare with the practice of money traffickers of putting their telephone numbers in the names of third parties?
>
> S.A. Carpio: Based on my training and experience, whenever traffickers utilize cell phones, they try to disguise names by placing it into somebody else's name, or there are phone companies that allow you to give names without any proper identification. Therefore, masking the real user of the telephone.

---

vouching should not be confused with the rule against "bolstering" as it is used in cases like <u>Francis</u> and <u>Balsam</u>.

-32-

Valdivia now challenges the admission of this testimony on two grounds:  (1) that the district court erred in permitting Carpio to cross the line from fact witness to expert witness without the appropriate qualification and prior notice, see Fed. R. Crim. P. 16(a)(1)(G), 26(a)(2); and (2) that even if Carpio's statements were properly characterized and admitted as expert testimony, they constituted "unwarranted and unreasonable use of [such] testimony about matters within the ordinary comprehension of jurors."  We review the admission of lay opinion and expert testimony for manifest abuse of discretion.  United States v. Lizardo, 445 F.3d 73, 83 (1st Cir. 2006); United States v. Montas, 41 F.3d 775, 783 (1st Cir. 1994).

The admissibility of lay opinion testimony is governed by Federal Rule of Evidence 701, which provides:

> If a witness is not testifying as an expert, testimony in the form of [opinions or inferences] is limited to [those which are] (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) <u>not based on scientific, technical, or other specialized knowledge within the scope of Rule 702</u>.

Fed. R. Evid. 701 (emphasis added).  Valdivia claims primarily that, as "scientific, technical, or other specialized knowledge," Carpio's testimony contravenes prong (c) of Rule 701.  That prong, appended to the rule by amendment in 2000, was intended to "eliminate the risk that the reliability requirements set forth in

-33-

Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Fed. R. Evid. 701, Advisory Committee's note to the 2000 amendments. While such sentiment is expedient in the abstract, the line between expert testimony under Rule 702 and lay opinion testimony under Rule 701 is, in practice, "not [an] easy [one] to draw." United States v. Colón Osorio, 360 F.3d 48, 52-53 (1st Cir. 2004); see also United States v. Hilario-Hilario, 529 F.3d 65, 72 (1st Cir. 2008) ("There is no bright-line rule to separate lay opinion from expert witness testimony."). Indeed, as we have previously noted, "the same witness - for example, a law enforcement officer - may be qualified to 'provide both lay and expert testimony in a single case.'" United States v. Ayala-Pizarro, 407 F.3d 25, 28 (1st Cir. 2005) (quoting Fed. R. Evid. 701, Advisory Committee's note). The statements proffered by Special Agent Carpio, however, do not straddle that hazy line, but rather fall comfortably within the boundaries of permissible lay opinion testimony.

It required no scientific or technical expertise within the scope of Rule 702 for Carpio to conclude, based on his experience in prior drug investigations, that traffickers often list unrelated third parties as their telephones' subscribers, and that, in this case, the phone account at issue was organized under a similar scheme. Such testimony was a product of Carpio's requisite personal knowledge, see Fed. R. Evid. 602, and also met

the requirements of Rule 701, because it was derived from "particularized knowledge that [Carpio had obtained] by virtue of his . . . position" as a drug enforcement agent tasked with investigating the De Sousa narcotics ring, Fed. R. Evid. 701, Advisory Committee's note. The district court therefore properly exercised its considerable discretion in admitting Carpio's testimony pursuant to Rule 701. See United States v. Maher, 454 F.3d 13, 24 (1st Cir. 2006) (holding that an officer's testimony that, based on his experience, certain post-it notes were likely drug orders and the number "4" likely referred to a quantity of the drug found by law enforcement "did not cross the line to become expert testimony"); Ayala-Pizarro, 407 F.3d at 29 (finding that an officer's testimony that heroin seized at drug points was typically packed in aluminum decks and that the heroin seized in the case was packaged in such decks was Rule 701 testimony).

That Carpio's testimony was of the lay opinion variety necessarily precludes Valdivia's second argument, that the use of an expert was improper. Because the argument also fails on the merits, however, we will address it briefly.

We have held, as Valdivia notes, that where expert testimony on a subject is "well within the bounds of a jury's ordinary experience," the risk of unfair prejudice outweighing probative value is not improbable. See Montas, 41 F.3d at 781-84. In essence, the appearance of an expert's imprimatur upon the

-35-

government's theory might unduly influence the jury's assessment of the inference being urged. Id. at 783-84. We are not faced with such a scenario here. For one thing, the challenged testimony was elicited by the government in direct response to defense counsel's line of questioning. The appellant, under the circumstances presented, cannot earnestly question the government's attempt to re-forge inferential links that he himself sought to sever. More importantly, the testimony was not so obviously within the jury's bounds of knowledge as to negate all probative value. The average juror may not be aware that some phone companies permit account subscriptions without the presentation of identification, nor might some jurors know that such a scheme is a common tactic for drug traffickers to conceal their identities. Accordingly, we find no abuse of discretion.

### E. Failure to Suppress the Aruban Wiretap Evidence

We next consider the appellant's suppression claim. Immediately following the jury's verdict, Valdivia filed a motion for judgment of acquittal and/or a new trial, see Fed. R. Crim. P. 29, arguing in part that the Aruban wiretap violated his Fourth Amendment rights, and evidence derived therefrom should have been suppressed under the exclusionary rule.[12] We review de novo the

---

[12] This claim was also the subject of multiple motions to suppress, a pre-trial order of the district court, and several admissibility rulings during trial. Valdivia, however, elects to raise the issue in the context of his Rule 29 motion.

district court's denial of Valdivia's Rule 29 motion.  United States v. Troy, 583 F.3d 20, 24 (1st Cir. 2009).

Ordinarily, the Fourth Amendment's exclusionary rule does not apply to foreign searches and seizures, for "the actions of an American court are unlikely to influence the conduct of foreign police." United States v. Hensel, 699 F.2d 18, 25 (1st Cir. 1983). There are, however, two well-established exceptions to this rule: (1) where the conduct of foreign police shocks the judicial conscience, or (2) where American agents participated in the foreign search, or the foreign officers acted as agents for their American counterparts.  United States v. Mitro, 880 F.2d 1480, 1482 (1st Cir. 1989).

Valdivia has not alleged, nor is there any indication, that the conduct of Aruban authorities in this instance might shock the judicial conscience; instead, Valdivia relies on the latter exception -- commonly referred to as the "joint venture" doctrine -- claiming that the combined investigatory efforts of Aruban and American agents brings the challenged wiretap evidence within the exclusionary purview of the Fourth Amendment.  We are not convinced.

At its core, Valdivia's argument rests on three factual propositions:  (1) that Special Agent Carpio, an American D.E.A. agent, was present in Aruba for significant portions of the wiretap investigation; (2) that Agent Carpio testified at trial concerning

-37-

"our intercept investigation of the [trafficking] organization . . . in Aruba"; and (3) that the district court acknowledged, in its order denying Valdivia's Rule 29 motion, that "there is no doubt that the United States participated in something called investigation by wiretapping in Aruba."

Putting aside, for the moment, the questionable weight of these three propositions, we first recount the following panoply of countervailing facts, which are plainly evident from the record: Aruban authorities had already initiated the investigation of De Sousa prior to the arrival of any American law enforcement personnel; the wiretap was neither requested nor in any way organized or managed by agents of the United States; the wiretap orders were sought from and approved exclusively by Aruban courts; and only Aruban officers actively participated in the implementation of wiretaps and recording of conversations -- indeed, American agents were permitted neither to enter the recording room nor listen to the recorded conversations while the investigation was ongoing. It was only after the investigation had concluded that Agent Carpio, through official government channels, requested an authorized copy of the recordings for purposes of domestic prosecution.

While Carpio did, in fact, characterize the operation as "our intercept investigation," he later clarified that he did so to justify his presence in Aruba, which required authorization by his

administrative superiors at the Drug Enforcement Agency. Moreover, although Carpio and other agents were present in Aruba during periods of the wiretap investigation, they were not active participants in the operation, did not carry guns, badges, or retain the authority to make arrests, and often worked on other unrelated cases.[13]

Thus, as clearly evinced by the record, the involvement, if any, of American agents in the Aruban wiretap investigation was minimal, and certainly not sufficient to support an application of the joint venture exception. Sans the exclusionary hook of the Fourth Amendment, Valdivia's suppression claim is without merit. See, e.g., United States v. LaChapelle, 869 F.2d 488, 490-91 (9th Cir. 1989) (holding that the joint venture exception did not apply where the foreign official who conducted the foreign investigation "stated explicitly . . . that American agents were not involved in initiating or controlling the contested [foreign] wiretap").

**F. Sentencing Challenges**

We turn, finally, to the appellant's request for resentencing. At the disposition hearing, the district court found Valdivia personally responsible for thirty kilograms of heroin,

---

[13] We need not formally address the merits of Valdivia's third factual proposition. The district court, while acknowledging some marginal "participation" by American agents, expressly rejected Valdivia's contention that such participation constituted a sufficient basis for the application of the joint venture doctrine. In any event, in light of our de novo review of the issue, the district court's statement is inapposite.

resulting in a base offense level (BOL) of 38. See USSG § 2D1.1(c)(1). The court then augmented the BOL by two levels, finding that the appellant had exercised managerial authority over another participant in the criminal activity. See USSG § 3B1.1(c). The adjusted offense level of 40, coupled with the absence of any previous criminal history, yielded an advisory guideline range of 292-365 months. Taking into account the dearth of prior criminal activity, the avoidance of any violent conduct, and Valdivia's obvious repentance, the district court applied a significant downward variance, imposing a total incarcerative term of 210 months.

Valdivia advances two assignments of error. First, he contends that the district court found him responsible for an excessive quantity of drugs, arguing that, at most, thirteen kilograms of heroin are attributable to him on the record, only one kilogram of which was seized (during Castro's October 2001 arrest). Second, he posits that the court should not have assigned him a managerial role where he never actually controlled any of his cohorts. Such fact-bound procedural claims are reviewed for clear error. See United States v. Rivera Calderón, 578 F.3d 78, 99 (1st Cir. 2009); United States v. Santos, 357 F.3d 136, 142 (1st Cir. 2004). Thus, unless, on the entirety of the evidence, we are left with the definite and firm conviction that a mistake has been

committed, the sentence must be upheld.  <u>Rivera Calderón</u>, 578 F.3d at 99-100.

We look first at drug quantity, which is an important factor in establishing a defendant's base offense level.  <u>See</u> <u>United States</u> v. <u>Sepulveda</u>, 15 F.3d 1161, 1196-97 (1st Cir. 1993). Where, as here, the government asserts that the amount of drugs seized understates the true scale of the offense, the court must employ every tool at its disposal to discern a reasonable approximation of the weight of the controlled substances for which a particular defendant should be held responsible.  <u>United States</u> v. <u>Eke</u>, 117 F.3d 19, 23 (1st Cir. 1997).  In making this assessment, the court may consider, for example, the price generally obtained for the controlled substance, financial or other records, or similar transactions in controlled substances by the defendant.  <u>See</u> USSG § 2D1.1, application note 12.  The court may also rely solely on the testimony of cooperating government witnesses, provided such testimony exhibits some indicia of reliability or support from the record.  <u>Rivera Calderón</u>, 578 F.3d at 100; <u>see</u> <u>Eke</u>, 117 F.3d at 24.  Ultimately, the sentencing court need only support a drug quantity determination by a preponderance of the evidence, and any approximation will be upheld as long as it represents a reasoned estimate.  <u>Santos</u>, 357 F.3d at 141.

The district court, in arriving at its calculation of thirty kilograms, relied principally on three sources from the

evidentiary record:  (1) the testimony of government witness Jeffrey Grueninger, De Sousa's closest and perhaps most knowledgeable associate, who averred in considerable detail that at least a substantial portion of the 120-125 kilograms of heroin shipped to Puerto Rico during the relevant time frame was, in fact, destined for Valdivia;[14] (2) the testimony of government witness Giovani Castro, who corroborated Grueninger's testimony in several respects, and confirmed that, on more than one occasion, he made sizable deliveries to Valdivia in Puerto Rico; and (3) recorded telephone conversations, during which various members of the criminal enterprise, including Valdivia himself, discussed topics from which some quantum of drug movement might be surmised.  In light of this evidence, and accounting for the potential puffery of cooperating witnesses, the court settled on thirty kilograms, significantly below the amount attributed to Valdivia by the government.

The appellant condemns the court's reliance on these sources, characterizing them as uncorroborated and generally insufficient -- yet he offers no contrary proof, nor does he assail

---

[14] Specifically, Grueninger testified that during the seven-month cruise ship off-season, Valdivia received roughly six kilograms of heroin per month, and during the five-month peak season, he received up to twelve kilograms of heroin per month. Additionally, he testified that smaller deliveries were made by traveling couriers like Giovani Castro on a more regular basis, resulting in a total delivery to Valdivia between October 2001 and April 2003 of more than one-hundred kilograms of heroin.

the credibility of either of the cooperating witnesses. To be sure, our cases require caution in estimating drug quantity, and we must take special care, where quantity can drastically alter the severity of a defendant's sentence, to "ensure that [such] findings are predicated on reliable information." United States v. Rivera-Maldonado, 194 F.3d 224, 233 (1st Cir. 1999). Ideally, a successful drug investigation would include the seizure of strong evidence such as detailed ledgers apportioning quantities to each criminal participant. Such is rarely the case, however. Under the present circumstances, given the consistent and mutually reinforcing testimony of Grueninger and Castro, buttressed by the content of multiple recorded telephone conversations, the sentencing court acted within its proper province in finding these to be reliable sources. Thus, based on the record before us, we cannot say that the court's quantity estimate was clearly erroneous.

Valdivia next challenges the district court's determination that he was an organizer, leader, or manager of the alleged criminal activity, which resulted in a two-level upward adjustment. His challenge lacks force.

The relevant sentencing guideline prescribes a two-level enhancement if the underlying criminal activity involved at least two, but fewer than five complicit individuals (including the defendant), and the defendant, "in committing the offense, . . .

exercised control over, managed, organized, or superintended the activities of at least one other participant." <u>United States</u> v. <u>Al-Rikabi</u>, 606 F.3d 11, 14 (1st Cir. 2010); USSG § 3B1.1(c).

The appellant brings a limited claim on appeal, challenging only the element of control. He asserts that the sentencing court erroneously based the enhancement on his "control over the <u>activities</u> of the criminal enterprise rather than over any <u>participants</u> in it." <u>See</u> <u>United States</u> v. <u>Ramos-Paulino</u>, 488 F.3d 459, 464 (1st Cir. 2007) (emphasis in original). The case law is indeed unambiguous that the "management of criminal activities, standing alone, does not constitute a basis for a role-in-the-offense enhancement under section 3B1.1." <u>Id.</u> Thus, to suggest a lack of managerial liability, Valdivia paints himself merely as an organizer of activities, responsible only for arranging deliveries, sales, and proceed collections. The historical evidence suggests otherwise.

Various excerpts from the record strongly indicate that the appellant directed and controlled at least Pabón and Castro, among others. For example, during several telephone conversations, Pabón opined that he could not authorize amounts, deliveries, or other arrangements without the express consent of Valdivia; and Grueninger, who regularly dealt with both Valdivia and Pabón, described Pabón as Valdivia's right-hand man. Additionally, on at least one occasion, Valdivia provided telephone numbers to the

courier Giovani Castro, with explicit instructions about whom to contact and when to initiate communications.

So long as the district court's managerial enhancement is based upon reasonable inferences drawn from adequately supported facts, we cannot find it to be clearly erroneous.  United States v. Rosado-Sierra, 938 F.2d 1, 2 (1st Cir. 1991).  So it is here.  The record more than adequately supports the inference that Valdivia was not merely an organizer of activities, but a manager of personnel in the Puerto Rico branch of De Sousa's drug-trafficking network.  Consequently, the district court did not clearly err in applying the two-level aggravating role adjustment in this case.

We conclude our sentencing discussion by recalling the not-insignificant fact that the district court adopted a rather substantial downward variance, to the tune of eighty-two months below the minimum recommended by the guidelines, and 150 months below the government's proposal at the disposition hearing.  The sentence was sound, and without more, we discern no basis to disturb it here.

### III. Conclusion

Appellate counsel has identified and ably pressed numerous claims in this appeal, and has established that the trial was not perfect.  But trials rarely are.  The district judge conscientiously addressed the issues presented to him and insured that the defendant was tried fairly.  Upon conviction by the jury,

the judge properly applied the sentencing guidelines, considered the relevant sentencing factors, and ultimately sentenced Mr. Valdivia to an incarcerative term well below the advisory guideline range.  There were no reversible errors, cumulatively or otherwise. The conviction and sentence are **<u>affirmed</u>**.

**APPENDIX**

18 U.S.C. § 3161(h)(1):

"(h) The following periods of delay shall be excluded in computing the time within which an information or an indictment must be filed, or in computing the time within which the trial of any such offense must commence:

(1) Any period of delay resulting from other proceedings concerning the defendant, including but not limited to-

(A) delay resulting from any proceeding, including any examinations, to determine the mental competency or physical capacity of the defendant;

(B) delay resulting from trial with respect to other charges against the defendant;

(C) delay resulting from any interlocutory appeal;

(D) delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion;

(E) delay resulting from any proceeding relating to the transfer of a case or the removal of any defendant from another district under the Federal Rules of Criminal Procedure;

(F) delay resulting from transportation of any defendant from another district, or to and from places of examination or hospitalization, except that any time consumed in excess of ten days from the date an order of removal or an order directing such transportation, and the defendant's arrival at the destination shall be presumed to be unreasonable;

(G) delay resulting from consideration by the court of a proposed plea agreement to be

entered into by the defendant and the
attorney for the Government; and

(H) delay reasonably attributable to any
period, not to exceed thirty days, during
which any proceeding concerning the defendant
is actually under advisement by the court."


**- Concurring Opinion Follows -**

**LIPEZ, <u>Circuit Judge</u>, concurring.** Bound by the precedents of our circuit, my colleagues and I must affirm the ruling of the trial court that Special Agent Carpio's testimony about the cell phone practices of drug traffickers was lay opinion testimony admissible under Rule 701, rather than expert testimony governed by Rule 702. However, we should reexamine these precedents in a future en banc proceeding.[15]

The government elicited the challenged testimony from Agent Carpio by asking, "[H]ow, if in any way, according to your experience as a narcotics investigator . . . does a telephone number registered in the name of a person compare with the practice of money traffickers of putting their telephone numbers in the names of third parties?" Carpio responded:

> <u>Based on my training and experience</u>, whenever traffickers utilize cell phones, they try to disguise names by placing it into somebody else's name, or there are phone companies that allow you to give names without any proper identification. Therefore, masking the real user of the telephone.

(Emphasis added.) The majority concludes that Carpio's testimony "fall[s] comfortably within the boundaries of permissible lay opinion testimony":

> It required no scientific or technical expertise within the scope of Rule 702 for Carpio to conclude, <u>based on his experience in prior drug investigations</u>, that traffickers

---

[15] This case is not a good candidate for an en banc proceeding because any error here was harmless.

> often list unrelated third parties as their telephones' subscribers, and that, in this case, the phone account at issue was organized under a similar scheme. Such testimony was a product of Carpio's requisite personal knowledge, <u>see</u> Fed. R. Evid. 602, and also met the requirements of Rule 701 because it was derived from "<u>particularized knowledge that [Carpio had obtained] by virtue of his . . . position</u>" as a drug enforcement agent tasked with investigating the De Sousa narcotics ring, Fed. R. Evid. 701, Advisory Committee's note.

(Emphasis added.) The underlined language reflects two flaws in our circuit's analysis of the difference between lay and expert opinion testimony. These flaws, discussed in Part II, have put us at odds with virtually every other circuit[16] and the commentary to

---

[16] <u>See</u> <u>United States</u> v. <u>Dukagjini</u>, 326 F.3d 45, 52 (2d Cir. 2002) (approving use of expert testimony about the operations of drug traffickers and coded language used in drug trafficking); <u>United States</u> v. <u>Watson</u>, 260 F.3d 301, 307 (3d Cir. 2001) (affirming admission of expert testimony about the operations of narcotics dealers, including packaging practices and associated paraphernalia); <u>United States</u> v. <u>Hopkins</u>, 310 F.3d 145, 150-51 (4th Cir. 2001) (approving admission of expert testimony about the methods and materials associated with drug trafficking); <u>United States</u> v. <u>Cuellar</u>, 478 F.3d 282, 293 (5th Cir. 2007) (acknowledging "routine" admission of expert testimony about the conduct and methods of operation unique to drug distribution, including drug smuggling), <u>rev'd</u> <u>on</u> <u>other</u> <u>grounds</u>, 553 U.S. 550 (2008); <u>United States</u> v. <u>Johnson</u>, 488 F.3d 690, 698 (6th Cir. 2007) (approving admission of expert testimony about conduct indicative of drug transactions); <u>United States</u> v. <u>York</u>, 572 F.3d 415, 420 (7th Cir. 2009) (approving use of expert testimony about coded language); <u>United States</u> v. <u>Peoples</u>, 250 F.3d 630, 641 (8th Cir. 2001) (collecting cases regarding use of expert police testimony and approving use of expert testimony about coded language); <u>United States</u> v. <u>Valencia-Amezcua</u>, 278 F.3d 901, 908-09 (9th Cir. 2002) (approving "commonplace" use of expert testimony about structure and organization of criminal enterprises); <u>United States</u> v. <u>Garcia</u>, 635 F.3d 472, 477 (10th Cir. 2011) (approving admission of expert testimony about the arms trade and significance of the types of

Rule 701 of the Advisory Committee on Evidence.

This is not an occasion for examining at length the incorrectness of our approach to the lay/expert opinion dichotomy and the unfairness that results for criminal defendants. That should be done in a future en banc proceeding or in a case where the dichotomy affects the outcome of the case. Here, I just want to highlight and explain the problem, beginning with some background facts, in the hope of eventually changing our law.

## I. The 2000 Amendments to the Federal Rules of Evidence

In <u>Daubert</u> v. <u>Merrill Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), the Supreme Court addressed the basic requirements for admitting expert testimony, rejecting what was then the framework for deciding whether expert testimony was admissible — the so-called <u>Frye</u> test of general acceptance in the particular field. <u>See</u> <u>Frye</u> v. <u>United States</u>, 293 F. 1013 (D.C. Cir. 1923). The <u>Daubert</u> Court held that the adoption of Rule 702 had rendered the <u>Frye</u> test obsolete.[17] <u>Daubert</u>, 509 U.S. at 588-89. Because the drafters did not cite <u>Frye</u> or use its "general acceptance" language, the Court concluded that they did not intend to adopt its

_____

firearms purchased); <u>United States</u> v. <u>Sarcona</u>, No. 10-10992, 2012 U.S. App. LEXIS 233, at *24-25 (11th Cir. Jan. 6, 2012) (approving use of expert testimony about concealment practices of criminals, including the mechanics of money laundering); <u>United States</u> v. <u>Wilson</u>, 605 F.3d 985, 1025-26 (D.C. Cir. 2010) (approving use of expert testimony about coded language).

[17] The Federal Rules of Evidence, including Rule 702, were enacted in 1975.

test for admissibility.  Id.  The Court found that the Frye standard was "absent from, and incompatible with, the Federal Rules of Evidence" and "should not be applied in federal trials."  Id. at 589.

The Daubert Court emphasized that "under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  Id. at 589. It found that Rule 702 contained implicit safeguards for reliability, based on the drafters' use of the terms "scientific" and "knowledge."  These two terms, the Court found, require a certain level of reliability from all expert testimony.  Id. at 590.  The Court set out five non-exclusive factors for trial courts to consider when determining whether such testimony meets the implicit reliability requirements of Rule 702: (1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review and publication; (3) what the known or potential rate of error of the technique or theory is when applied; (4) whether the expert maintained standards or controls; and (5) whether the technique or theory has been generally accepted in the scientific community. Id. at 593-95.  Subsequently, in its 1999 decision in Kumho Tire Co. v. Carmichael, the Court stated that trial courts should apply a Daubert-style analysis to all expert testimony, not just testimony based explicitly on science.  526 U.S. 137, 149 (1999).

Rule 702[18] was then amended in 2000 to incorporate the inquiry trial courts must undertake pursuant to <u>Daubert</u> and <u>Kumho</u> and thereby enhance the reliability of expert testimony. At that time, the rule drafters were aware of a federal case law trend in the 1980s that blurred the distinction between lay opinion testimony and expert testimony. Increasingly, lay witnesses were permitted to offer opinions on matters that required at least some amount of specialized knowledge or experience. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Paiva</u>, 892 F.2d 148 (1st Cir. 1989) (finding no abuse of discretion where lay witness identified a substance as cocaine based on past experience with the taste and appearance of the substance); <u>Soden</u> v. <u>Freightliner Corp.</u>, 714 F.2d 498 (5th Cir. 1983) (allowing lay witness opinion testimony that a certain truck design was dangerous and defective based on witness's 18 years of experience in the trucking industry). The drafters realized that

---

[18] Federal Rule of Evidence 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
    (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
    (b) the testimony is based on sufficient facts or data;
    (c) the testimony is the product of reliable principles and methods; and
    (d) the expert has reliably applied the principles and methods to the facts of the case.

this jurisprudence allowing more and more opinion testimony under Rule 701[19] threatened to undermine the safeguards set forth in Rule 702 to enhance the reliability of expert testimony.  If lay witnesses could offer the same types of opinion testimony as experts, there would be a significant incentive for attorneys to circumvent the rigorous <u>Daubert</u> framework incorporated in Rule 702 and bring opinion testimony in under Rule 701.  Hence, the drafters added a provision to Rule 701, now codified as Rule 701(c), stating that lay opinion testimony is inadmissible if it is "based on scientific, technical or other specialized knowledge within the scope of Rule 702."  The Advisory Committee explained that the purpose of this amendment was to "eliminate the risk that the reliability requirement set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing."  Fed. R. Evid. 701 advisory committee's notes.

---

[19] Federal Rule of Evidence 701 states:

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
    (a) rationally based on the witness's perception;
    (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
    (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

## II. Our Circuit's Interpretation of the 2000 Amendments

Regrettably, our precedents have abetted the very risk that the Advisory Committee sought to avoid. That is so because we have misunderstood the significance of language from the Rules and the Advisory Committee's notes in at least two ways. First, we have classified officer testimony based on law enforcement experience as lay opinion testimony because officers base such testimony on knowledge "personally acquire[d] through experience, often on the job." United States v. Maher, 454 F.3d 13, 23 (1st Cir. 2006). Such testimony, however, is precisely the sort of testimony based on "knowledge, skill, experience, training, or education" contemplated by Rule 702. Fed. R. Evid. 702 (emphasis added).

Second, we have misread language from the Advisory Committee's notes. The notes describe business owners providing lay testimony about "the value or projected profits of the business, . . . not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business." Fed. R. Evid. 701 advisory committee's notes. We have ignored the limiting language of the Advisory Committee's notes and applied the "by virtue of his or her position" language to generalized police testimony about, for example, the regular practices of drug traffickers. See United

States v. Ayala-Pizarro, 407 F.3d 25, 28-29 (1st Cir. 2005) (classifying general testimony about how drug operations work as lay testimony "because it was based on 'particularized knowledge that the witness [had] by virtue of his . . . position' as a police officer assigned to patrol the neighborhood" (emphasis added) (quoting Fed. R. Evid. 701 advisory committee's notes)).[20]

The Seventh Circuit ably described the flaws in our analysis when it rejected our interpretation of Rules 701 and 702 in United States v. Oriedo, 498 F.3d 593, 603 n.10 (7th Cir. 2007):

> The Government urges this court to adopt the contrary approach outlined by the First Circuit in United States v. Ayala-Pizarro, 407 F.3d 25, 28-29 (1st Cir. 2005), cert. denied, 546 U.S. 902 (2005). The court held that, where an officer's testimony as to narcotics packaging was based on his personal knowledge acquired from experience in investigating drug trafficking, it was not technical or specialized within the meaning of Rule 701's limitations, but was simply particularized lay testimony. We are not persuaded by the reasoning employed in this case.
>
> First, we note that the Advisory Committee Notes to Rule 701 themselves cite with approval United States v. Figueroa-Lopez, 125 F.3d 1241, 1246 (9th Cir. 1997), for the proposition that law enforcement testimony that particular conduct is consistent with drug trafficking should be viewed as expert testimony within Rule 702, because to view it as lay testimony "subverts" the disclosure requirements for expert testimony. Fed. R.

---

[20] I have contributed to our misguided analysis on these lay/expert opinion testimony issues in a number of cases, including as a member of the panel in Ayala-Pizarro.

Evid. 701 (Advisory Committee's Note). We also conclude that <u>Ayala-Pizarro</u> confuses the Note's reference to the kind of "particularized knowledge" that a lay person may have of the value of their own business with the kind of "specialized knowledge" that brings testimony within Rule 702. The business owner has knowledge of his own business <u>in the particular</u>; a narcotics officer who draws on his broad experience, acquired from his observations outside of this particular case, relies on his <u>specialized</u> knowledge of drug trafficking to draw conclusions about the particular case. Finally, under the First Circuit's reading of the Rules in <u>Ayala-Pizarro</u>, a substantial argument could be made that anyone who acquires broad knowledge of a topic through <u>direct experience</u> would qualify as a lay witness; Rule 702 itself, however, specifically defines a witness' qualification as an <u>expert</u> to arise because of "knowledge, skill, <u>experience</u>, training or education." Fed. R. Evid. 702 (emphasis added).

As the Seventh Circuit has aptly noted, the explicit language of Rule 702 sets forth a bright line rule. If a witness has acquired "specialized knowledge" on the basis of "knowledge, skill, experience, training or education," and presents that knowledge to a jury "in the form of an opinion or otherwise," that witness is testifying as an expert witness, Fed. R. Evid. 702, who is subject to the disclosure requirements for expert testimony.[21] In the absence of such disclosure, opposing counsel are denied an

---

[21] Before trial, a party must disclose the identity of any expert witness it may use at trial. That disclosure must include, among other things, the subject matter on which the witness is expected to testify and a summary of the facts and opinions to which the witness is expected to testify. Fed. R. Civ. P. 26(2); Fed. R. Crim. P. 16(a)(1)(G), (b)(1)(C).

opportunity to secure their own experts or immerse themselves in the area of expertise and develop a meaningful cross-examination. The result may be the presentation of expert testimony by a lay witness whose reliability is not meaningfully tested.

In this case, as noted, the government asked Agent Carpio "[H]ow, if in any way, according to your experience as a narcotics investigator . . . does a telephone number registered in the name of a person compare with the practice of money traffickers of putting their telephone numbers in the names of third parties?" This question asked him to give his opinion on whether the particular conduct of the defendant in this case was consistent with drug trafficking generally. To answer this question, he drew on specialized knowledge that he acquired from years of experience investigating drug cases:

> Based on my training and experience, whenever traffickers utilize cell phones, they try to disguise names by placing it into somebody else's name, or there are phone companies that allow you to give names without any proper identification. Therefore, masking the real user of the telephone.

Such testimony falls squarely within the characterization of expert testimony in Rule 702. In so far as I can tell, no other circuit would conclude otherwise.[22]

---

[22] I acknowledge that the analysis in this case is complicated by the fact that the challenged testimony arguably arose because of the nature of defense counsel's cross-examination of Agent Carpio, which the government could not anticipate. It is not necessary to determine the effect of that complication in this case. The

We have complained in prior cases that the line between expert testimony under Rule 702 and lay testimony under Rule 701 is, in practice, "not [an] easy [one] to draw." United States v. Colón Osorio, 360 F.3d 48, 52-53 (1st Cir. 2004); see also United States v. Hilario-Hilario, 529 F.3d 65, 72 (1st Cir. 2008) ("There is no bright-line rule to separate lay opinion from expert witness testimony."). This is a difficulty of our own making. Instead of focusing on the purpose of the question being asked (is the particular conduct in this case consistent with drug trafficking generally), and the basis for the witness's answer (training and experience), we make the problematic judgment that the majority makes in this case ("It required no scientific or technical expertise within the scope of Rule 702 for Carpio to conclude, based on his experience in prior drug investigations, that traffickers often list unrelated third parties as their telephones' subscribers, and that, in this case, the phone account at issue was organized under a similar scheme.")

I understand the appeal of this judgement. At the core of Carpio's testimony is the seemingly common sense notion that drug traffickers try to conceal their conduct. Why do we need a battle of experts, or carefully prepared cross-examination, to test

significant point is that if Agent Carpio's testimony had been elicited through direct examination, it should have been subject to the requirements placed on expert testimony. Under our precedent, it would not be.

for jurors the reliability of such testimony?  The answer is that the simplicity of Carpio's testimony is deceptive.  The issue is not the impulse of traffickers to conceal their conduct, but rather the specific practices they use to do so.  Perhaps many traffickers, instead of using registered phones, use disposable phones, which do not require the use of anyone's name.  Perhaps phone companies are not as willing as Carpio suggests to allow registration without proper identification.  These possibilities involve specialized knowledge that lawyers do not usually possess. They involve knowledge beyond the experience of most jurors. Hence, we should be wary of making the qualitative judgment that the opinion testimony of police officers that otherwise meets the requirements of Rule 702 is so simple or obvious that we can treat it as lay opinion testimony under Rule 701.  Our readiness to make these judgments has created the hazy line that we complain about. It has created in some of our precedents an unwarranted police exception from the requirements applicable to expert testimony.

We need to rethink these precedents.  We need to apply the bright line rule that the language of Rule 702 provides in deciding whether a police officer is testifying as a fact witness or an expert witness.  If the officer is being asked to draw on specialized knowledge acquired through experience and training to offer an opinion on the inculpatory significance of the particular conduct of the defendant, that officer is testifying as an expert

witness.  I recognize that such application of the rule may add to the burden of a prosecution that has to comply with the disclosure requirements applicable to expert witnesses.  <u>See</u> Fed. R. Civ. P. 26(2); Fed. R. Crim. P. 16(a)(1)(G), (b)(1)(C).  The prosecution will have to think through in advance of trial exactly how police witnesses will be used at trial.  But these burdens do not deny the prosecution the use of any testimony that they deem essential to their cases.  At the same time, these burdens increase the likelihood that defense counsel will be able to fairly test the reliability of the opinion testimony of police officers who draw on their experience and training to characterize the particular conduct of the defendant as classic criminal conduct.  That is how the system should work.